GIPSON *v.* INGRAM.

4-8982                                             223 S. W. 2d 595

Opinion delivered October 17, 1949.

*Kenneth C. Coffelt,* for appellant.

*W. W. Sharp, H. S. Yocum, Ike Murry,* Attorney General, and *Arnold Adams,* Assistant Attorney General, for appellee.

*Rose, Dobyns, Meek & House, Amici Curiae.*

Ed. F. McFaddin, Justice. This is the so-called "Cash Fund" case. Appellant (plaintiff below) filed proceedings in the ·Chancery Court, claiming relief as a citizen and taxpayer. The defendants (appellees here) were: the State Comptroller, L. R. Beasley, and other persons as the board members in charge of various state agencies and institutions and their disbursing agents. Some of the institutions are: the University of Arkansas, Henderson State Teachers College, the State Hospital for Nervous Diseases and the State Tuberculosis• Sanitorium.[1] We will refer to the State Comptroller as such,

[1] Plaintiff listed defendants as follows: "Mrs. H. B. Ingram, Faber White, Dr. H. King Wade, Ross McDonald and Latane Temple, as the Board of Control and Members of the Board of Control of the Hospital for Nervous Diseases for Arkansas, a public institution; and John C. Black, Fred I. Brown, Dr. Euclid M. Smith, P. E. Murphy, Raymond F. Orr, Herbert Thomas, W. W. Sharp, Wiley T. Jones, Jackson T. Stephens and Henry S. Yocum, Sr., as the Board of Trustees and Members of the Board of Trustees for the University of Arkansas, a public institution; and Herschel Garner, J. W. Sanders, J. T. Cone, J. E. Chism and R. C. Grisson, as the Board of Control and Members of the Board of Control of the Arkansas Boys' Industrial School for Negroes, a public institution; and Charles O. Smithers and W. G. Wofford, as the Disbursing Officers, Business Managers and Directors of Finance for the said Arkansas Hospital for Nervous Diseases and its said Board of Control and its Members hereinabove named; and T. C. Carlson, as the Disbursing Officer, Business Manager and Director of Finance for the University of Arkansas and its said Board of Trustees and its Members hereinabove named; and R. D. Moore, as the Disbursing Officer, Business Manager and Director of Finance for the Arkansas Boys' Industrial School for Negroes, and its said Board of Trustees and its Members, hereinabove named; and L. R. Beasley, as Comptroller for the State of Arkansas."

and to all the other defendants as "state agencies and institutions."

Plaintiff's pleadings allege: (1) that each of the said state agencies and institutions has a cash fund derived from various sources; (2) that all such cash funds are public money and should be deposited immediately in the state treasury and expended only after appropriation acts by the Legislature; (3) that the state agencies and institutions are expending these cash funds as the governing boards see fit, and without legislative appropriation; (4) that the State Comptroller is auditing and not officially disapproving expenditures from the cash funds by the state agencies and institutions, and that the State Comptroller should be restrained from approving vouchers for payment from said cash funds;[2] and (5) that some portions of the said cash funds of some of the state agencies and institutions are being used to supplement the salaries paid employees, so that such employees are in fact receiving compensation greater than the amount fixed by the Legislature.

The prayers of the plaintiff's pleadings were:

" . . . that the Court enjoin temporarily and permanently the defendants, and each of them, from appropriating, paying out or in any manner depleting any of such funds herein referred to now in their possession, or that may come into their possession in the future, which have not been appropriated for a specific purpose by an Act of the Arkansas Legislature; and that this Court issue a mandatory injunction against the defendants, and each of them, requiring them to deposit any and all of such funds now in their possession or under their control, or that may come into their possession or under their control, in the treasury of the State of Arkansas; that the State Comptroller, L. R. Beasley, be restrained from approving for payment any voucher of any kind or character whatsoever against any fund of any of the State institutions herein named, known as

[2] Act 63 of 1933 established the system complained of in this case. See also §§ 13-212, et seq., Ark. Stats. (1947) regulating the auditing of cash funds of various state agencies and institutions.

'cash funds' or funds which have not been previously appropriated by the Arkansas Legislature for specific purposes; that the order of the Court herein apply not only to the defendants herein named, but to their successors in office; that defendants, and each of them, be restrained temporarily and permanently from in any manner paying out or in any manner causing to be paid out any of such funds named in this cause for salaries of any officer or employee of any of the institutions or agencies named in this cause, which salaries have not previously been fixed and appropriated by the Legislature, and for any and all other proper relief to which the complainant herein may be entitled in equity.''

Answers filed by some of the defendants alleged the corporate status of the state agencies and institutions represented by them, while other answers denied every material allegation of the plaintiff's pleadings. All answers prayed that the proceedings be dismissed. The case was heard on oral evidence, to which we will hereinafter refer. The Chancery Court entered a decree dismissing the complaint; and there is this appeal challenging the correctness of that decree.

There is only one allegation that anything is being done in violation of what the Legislature has permitted, and that allegation is that some portions of the cash funds are being used to supplement the salaries of certain employees, so that such employees are receiving compensation greater than the amounts fixed by the Legislature. This allegation will be discussed in topic II, *infra*. All the other allegations involve the question, whether the Legislature has proceeded in a constitutional manner. That will be discussed in Topic I, *infra*.

I. *The Constitutional Question.* Appellant cites Art. V, § 29 of the Constitution: ''No money shall be drawn from the treasury except in pursuance of specific appropriations made by law, the purpose of which shall be distinctly stated in the bill, and the maximum amount which may be drawn shall be specified in dollars and cents; and no appropriations shall be for a longer period than two years.'';

and, also, Art. XVI, § 12: "No money shall be paid out of the treasury until the same shall have been appropriated by law, and then only in accordance with said appropriation."

The constitutional provisions, as above quoted, refer to "the treasury." The case of Straub v. Gordon, 27 Ark. 625[3] holds that "the treasury" means the *state* treasury. So the constitutional language "no money shall be paid out of (drawn from) the treasury . . ." necessarily refers only to money that has reached the *state* treasury, and does not refer to money held elsewhere.

Appellant urges that all the money received by the various state agencies and institutions[4] should be paid into the state treasury, and that the Legislature is without power to authorize otherwise. It is shown by the proof that many, if not all, of the state agencies and institutions involved in this suit have cash funds—derived from such sources as students' fees, sale of farm produce, dormitory charges, etc.—held by said institutions and agencies either under express legislative permission or under circumstances known to the Legislature and not prohibited by it. It was also shown that no part of the cash funds of any of the state agencies and institutions is derived from taxes, but, rather, from the operation of such state agencies and institutions. So, for

---

[3] *Straub* v. *Gordon* involved a provision of the Arkansas Constitution of 1868. The opinion was delivered in 1872, so the definition of "treasury" had been judicially determined before those words were employed in our present Constitution of 1874.

[4] The complaint lists the following cash funds: "Land Department; Barber Examiners Board; Licensing Board General Contractors; Labor Department, Boiler Inspection Division; Employment Security Division; Public Service Commission; Revenue Department; State Plant Board; Resources and Development Commission; State Hospital; Tuberculosis Sanatorium; McRae Memorial Sanatorium; Confederate Home; White Boys' Industrial School; Arkansas Girls Training School; Health Department; Board of Cosmetology; Livestock Sanitary Board; Arkansas Merit System Council; University of Arkansas Medical School; University Extension Service; State Teachers College; Henderson State Teachers College; Arkansas State College, Jonesboro; Arkansas Polytechnic College; A. and M. College, Magnolia; A. and M. College, Monticello; A. M. and N. College, Pine Bluff; Junior Agricultural College; Education Department; Vocational Education; Library Commission; School for the Blind; School for the Deaf; Supreme Court Library; Vocational Training School, Clinton; Vocational Training School, Huntsville; War Memorial Stadium Commission; and Educational Department Surplus Property."

purposes of this topic "cash funds" are those received by the state agencies and institutions from sources other than taxes, as the term "taxes" is ordinarily used.

The question is, whether the Constitution of Arkansas requires that all such cash funds be deposited into the state treasury. If it does, then the appellant is correct on this point; if it does not, then he is in error. In determining the answer to the posed question, we emphasize that the Legislature, as the supreme law-making body, possesses all legislative powers except those expressly or impliedly prohibited by the Constitution. State v. Ashley, 1 Ark. 513; Straub v. Gordon, 27 Ark. 625; Bush v. Martineau, 174 Ark. 214, 295 S. W. 9.[5] So we examine the Constitution to see if the Legislature is prohibited from allowing the state agencies and institutions to have and disburse cash funds.

It will be observed that both in Art. V, § 29 and Art. XVI, § 12, as previously copied, it is required that no money shall be drawn from the treasury until the same shall have been duly appropriated. There is no

[5] This Court used the following language in this opinion, all of which is apropos to the case at bar: "Before proceeding to a discussion of the issues raised by this appeal, we deem it proper to premise our remarks by two fundamental rules of construction announced and adhered to throughout the history of this court. First, that the Constitution of this State is not a grant of enumerated powers to the Legislature, not an enabling, but a restraining act (Straub v. Gordon, 27 Ark. 625), and that the Legislature may rightfully exercise its powers subject only to the limitations and restrictions of the Constitution of the United States and of the State of Arkansas. St. L. I. M. & S. Ry. Co. v. State, 99 Ark. 1, 136 S. W. 938; Vance v. Austell, 45 Ark. 400; Carson v. St. Francis Levee Dist., 59 Ark. 513, 27 S. W. 590; Butler v. Board, etc., 99 Ark. 100, 137 S. W. 251. In other words, as was said in McClure v. Topf & Wright, 112 Ark. 342, 166 S. W. 174: 'It is not to be doubted that the Legislature has the power to make the written laws of the State, unless it is expressly, or by necessary implication, prohibited from so doing by the Constitution, and the act assailed must be plainly at variance with the Constitution before the court will so declare it.' Second, that an act of the Legislature is presumed to be constitutional, and will not be held by the courts to be unconstitutional unless there is a clear incompatibility between the act and the Constitution; and further, that all doubt on the question must be resolved in favor of the act. State v. Ashley, 1 Ark. 513-552; Eason v. State, 11 Ark. 481; Dabbs v. State, 39 Ark. 353, 43 Am. Rep. 275; Sallee v. Dalton, 138 Ark. 549, 213 S. W. 762; and in Standard Oil Co. of La. v. Brodie, 153 Ark. 114, 239 S. W. 753, this court quoted the language of the Supreme Court of the U. S. in Hooper v. California, 155 U. S. 657, 15 S. Ct. 207, 39 L. Ed. 297, that 'the elementary rule is that every reasonable construction must be resorted to in order to save the statute from unconstitutionality.'"

language in our present Constitution which requires that all of the public money shall be paid into the state treasury. Such a provision exists in the Constitutions of some States, but not in our present Constitution. For instance, in the Arkansas Constitution of 1868 there was a provision (Art. X, § 17) which read: "The general assembly shall tax all privileges, . . . and the amount thus raised shall be paid into the treasury."[6]

Likewise, the 1875 Constitution of Missouri provides in Art. IV, § 43: "All revenue collected and all moneys received by the State from any source whatsoever shall go into the treasury, . . ."

In the 1902 Constitution of Virginia, § 186, there is this language: "All taxes, licenses and other revenue of the State shall be collected by its proper officers and paid into the state treasury. No money shall be paid out of the state treasury except in pursuance of appropriations made by law; . . ."

It will be observed that in the quoted provisions from these Constitutions there is the requirement of deposit into the treasury. But when these Constitutions are compared with the present Arkansas Constitution (of 1874), it is clear that our present Constitution requires only that money in the treasury shall not be removed except by legislative appropriation. There is no requirement in the present Arkansas Constitution that all public money shall be paid into the state treasury. The absence of such a provision from our present Constitution appears to have been a studied and deliberate omission. Certainly, such omission leaves the Legislature of this State free to provide that public money derived as in this case may be deposited as cash funds, for use by the state agencies and institutions.

To buttress the conclusion reached, we point out that Art. VI, § 22 of our present Constitution provides that the State Treasurer: " . . . shall perform such duties as may be prescribed by law."

---

[6] This constitutional provision was involved in the case of *Straub* v. *Gordon*, 27 Ark. 625 (decided in 1872).

Thus the Constitution clearly empowers the Legislature to decide whether the State Treasurer shall be required to receive all state funds. This Art. VI, § 22 of our present Constitution was so worded in light of the fact then existing that the Revised Statutes of 1836 (Chap. 18, § 22) prescribed the Treasurer's duties: "To receive and keep all monies of the State not expressly required by law to be kept by some other person . . ."[7]

The conclusion is inescapable that the Constitution of 1874 empowered the Legislature to state what money should be paid into the state treasury.

It was conceded by appellees in the oral argument that all the cash funds of the state agencies and institutions are public moneys. The Legislature could require that all these funds be paid into the state treasury, and the Legislature could require that none of these funds be expended without appropriation by the Legislature. But the question here is not what the Legislature might do with these funds. The question is whether the Constitution requires that all these moneys be paid into the state treasury. We find no such provision. To that extent the appellant is in error in this case.

II. *Use of Cash Funds to Supplement Salaries.* Some of the legislative appropriation acts for the state agencies and institutions by express language have limited the salaries of various employees to amounts not in excess of those expressed. The proof in this case shows that, notwithstanding such restrictive language, some of the state agencies and institutions have used some of the cash funds to supplement such salaries, with the result that some employees are receiving salaries greater than those fixed by the Legislature, as aforesaid. This is an illegal procedure, and the appellant is entitled to have an injunction against such procedure. Art. XVI, § 4 of the Constitution of Arkansas says: ". . . and the number and salaries of the clerks and employees of different departments of the State shall be fixed by law."

---

[7] Chap. 18, § 22 of the Revised Statutes of 1836 is now § 5526, Pope's Digest and § 12-609, Ark. Stats. of 1947. See *Newton* v. *State*, 33 Ark. 276.

One illustration suffices to make clear our holding. By Act 169 of 1949 the Legislature made appropriation for the maintenance and operation of the University of Arkansas for the biennial period ending June 30, 1951. Section 1 of the Act reads in part:

"There is hereby established for the University of Arkansas the maximum number of officials and employees necessary for the maintenance and operation of said department, *and the maximum rates of salaries for said officials and employees;*[8] and there is hereby appropriated, to be payable from the University of Arkansas fund, for said salaries and other purposes, as set out herein, the following:

Maximum Annual<br>Salary Rate

. . . . . . . . .

"14. Salary of 30 staff members, not to
 exceed per year each...................................$4,800.00".[9]

Thus by this Act the Legislature has prescribed the maximum salary[10] that may be received from the public funds; and it is illegal for any state agency or institution to use a portion of its cash fund (which is public money, as previously stated) to increase the salary fixed by the Legislature.

It was conceded by the appellant in the oral argument that authority of the Legislature to fix compensation in excess of the constitutional limitation is not presented in this case.[11] Neither are we here concerned with the sufficiency or insufficiency of the language in the said appropriation act quoted,[12] nor the question of a "line-by-line" appropriation.[13] We are concerned here only with the fact that in some instances it has been

---

[8] Italics our own.

[9] The proof did not relate to this particular item. We have used it merely to illustrate the situation.

[10] In *Humphrey* v. *Wyatt,* 188 Ark. 676, 67 S. W. 2d 209, we discussed the fixing of salaries. Concerning "extra compensation," see Art. V, § 27 of the Constitution.

[11] See Art. XIX, § 23 of the Constitution.

[12] See Art. V, §§ 29 and 30 of the Constitution.

[13] See Art. XVI, § 4 of the Constitution.

shown that the maximum annual salary as limited in the appropriation act has been supplemented with money from the cash fund. We hold that when the Legislature fixes the maximum annual salary of an employee, then no state agency or institution may use any part of its cash fund to supplement or enlarge the salary so fixed by the Legislature, and the State Comptroller should disapprove any expenditure from such cash fund of any amount to any employee, if such expenditure results in the employee's thereby receiving a greater salary than fixed by the Legislature, and the state agency or institution so offending should be enjoined from paying out cash funds that accomplish such result.

In this connection, we point out that some employees (for example, see § 17-517 Ark. Stats. of 1947) receive additional compensation derived from federal as well as county sources, and some also from endowments or gifts. The legislative determination in the appropriation act of a maximum annual salary does not prohibit such supplementation from funds from such other sources, as these are not "cash funds" within the purview of this topic. No injunction should prohibit the supplementation of salaries by the use of funds given for salary purposes by sources not controlled by the Legislature, such as private donations and federal grants. Of course, the agencies and institutions may accept donations earmarked for salaries, even though they may not use general cash funds to increase the salaries fixed by the Legislature.

Therefore we reverse only that part of the decree which dismissed the portion of plaintiff's complaint' covered by this topic II of this opinion; and we remand the cause on this Topic II, to the Chancery Court, to enter a decree in accordance with this opinion. In all other respects the decree of the Chancery Court is affirmed.

LEFLAR, J., disqualified and not participating.

GRIFFIN SMITH, Chief Justice, (dissenting). This is the first time since 1836, and the only time during the

75 years of rule under the Constitution of 1874, that there has been judicial affirmation of the proposition that a public fund belonging to the people in their governmental capacity may be dealt with by boards, commissions, institutions and agencies under a plan giving to them unrestricted authority to act with complete indifference to the public treasury, absent the formality of appropriation.

No appellate court, in similar circumstances, has made a more far-reaching determination—nor one so fanciful and better adapted to extravagant expediency.

To say that after the lawmaking power has created an agency with the right in it, either express or implied, to collect an appreciable part of the state's money, and that this agency may in turn disburse it at its will for salaries, wages, commodities, travel expense, and multitudinous incidentals in respect of which the legislature has intentionally or through inadvertence withheld formal sanction, and to hold that any such public money not actually deposited in the treasury or earmarked by an Act for that department is an asset subject to the discretionary use of those who have been appointed, selected, elected or employed, — these mere statements and the liberality of opinion that christen their birth are, to say the least of it, novel to the point of seeming incredibility.

We must therefore turn to the assigned reason upon which the innovation rests for a guiding rule. We must see whether a rule of construction applied by the Court's majority, or the interpretation of constitutional language, finds support in precedent or sanction in reality.

It is pertinent that we ascertain whether *that* reason comports with the dignity of purpose, the clarity of expression, and the penetrating vision attending deliberations of Grandison D. Royston as president, and other delegates to the constitutional convention. We are permitted to inquire if meaning given to Articles devoted to revenues, and to Sections on expenditures, carries into effect with practical certainty the thought of our founding fathers in creating within the government three co-

ördinate departments: the legislative to say by express enactment from what sources money should come and how spent; the executive to collect and apply this revenue when affirmatively authorized by appropriations to do so; and the judicial, when conflict arises, to adjudge whether either department has transgressed the inherent rights of the other, or trespassed upon its sanctions.

It is said that interpretation differs from construction in that the former is the art of ascertaining the true sense of any form of words; that is, the sense which their author sought to convey. Construction, on the other hand, is the drawing of conclusions as to subjects that lie beyond direct expressions of the text. Thus conclusions are reached which are in the spirit, though not in the letter, of the text. Construction comes when there is contradiction in different parts of the same writing, or conflict between terms used in separate documents that should be read together.[1]

The majority's citation to *Straub & Lohman* v. *Gordon,* 27 Ark. 625, does not add to or detract from the issues presented here. The decision was under the Constitution of 1868, and it merely held that when the general assembly was told to tax all useless privileges, pursuits, and occupations, and directed that the money *should be paid into the treasury,* the sheriff who held the fund should remit to Little Rock, and not to Phillips County.

But, say the participating Judges, since "treasury" means *state,* and since, by the organic law of 1874, no money may be drawn except by appropriation, this language *"necessarily refers only to money that has reached the state treasury, and does not refer to money held elsewhere."*

The corollary is implicit, under this construction, that if public funds have not actually reached the treasurer, and the general assembly has not legislated with reference to their use, expenditure may be lawfully made without the formality of appropriation.

[1] See Cooley's Constitutional Limitations, 8th Ed., ch. 4, 223 S. W. 2d 38½.

Cash Fund money comes, in some instances, from fees authorized by law, but with no express provision for handling it. In other cases the agency assesses under its self-asserted implied power of discretion. Millions pass through administrators who act independently of legislation, relying upon usage for approval.

The record does not suggest that those drawn into the controversy are dishonest in exercising this so-called privilege; nor does the writer here intend to create a suspicion that irregularity of a personal nature is practiced. The contrary appears to be true. For example, the Supreme Court itself is one of the defendants. Filing fees are deposited in a local bank and drawn by check for library purposes. But the fact that this has been done under unofficial judicial sanction for nearly a century does not make it legal. On the contrary, it serves to emphasize the fruits of prolonged legislative procrastination, and the unwholesome consequences that can follow.

I think one effect of today's opinion is to say that the state treasurer, whose constitutional status in the executive department was provided for by § 1 of Art. 6, has *permissive* duties only, and that responsibility does not begin until affirmative requirements have been legislatively prescribed. If Cash Funds are public moneys, as the opinion concedes, and if there is no requirement that *"public money"* must pass into the treasury, and if, as the opinion points out, the absence of such mandate ". . . [*was*] *a studied and deliberate omission"* from the Constitution,—then certainly, if these conclusions of the Court's majority are sound, the general assembly is left to its own devices in avoiding other parts of the Constitution. For example, maximum official salaries are fixed by § 23, Art. 19, at $5,000. Reasonable persons will concede that under existing conditions, and with constantly increasing duties, many public officials whose compensation has not been increased through constitutional amendment are deplorably underpaid. Others serve under statutory authority, and at least *prima facie* they cannot be paid more than the maximum fixed in

1874. But today's opinion points a way to better pay through *failure* of the general assembly to fix these salaries, or by repealing those already fixed. It may, by negative or affirmative action, permit all fees and commissions to be withheld from the treasury.

By wiping out statutes fixing salaries of the several agencies, such as the Commissioner of Education, Penitentiary Superintendent, Commissioner of Insurance, Bank Commissioner, and may others similarly situated, administrators or supervising boards especially created for that purpose could fix all salaries not constitutionally set, name the number of employees, apportion their compensation—and, by and large, handle the state's undeposited money in any manner not expressly prohibited. While money arising from excise and ad valorem taxes and assessments is not discussed in the opinion, yet the decision at least inferentially draws within its scope all funds that for any cause other than legislative action may be found outside of the treasury.

I do not assume that the lawmaking body will undertake to exercise its full power within this fertile field of finance. The presumption should be that it will not lend an attentive ear to the entreaties from pressure groups, however indefinite the Constitution may be said to be.

Most writers agree with Judge Cooley in his assertion that a principal share of the benefit expected from written constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion. "It is with special reference to the varying moods of public opinion", says he, "and with a view of putting the fundamentals of government beyond their control, that these instruments are framed; and there can be no such steady and imperceptible change in their rules as inheres in the principles of the common law. These beneficent maxims of the common law which guard person and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more minute, particular, and pervading in their protections. . . .

Public sentiment and action affect such changes, and the courts recognize them; but a court or legislature which would allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of the founders would be justly chargeable with . . . disregard of public duty; and if its course should become a precedent, these instruments would be of little avail. The voice of public passion is quite as likely to be in the direction of oppression as in any other; and the necessity for bills of right in our fundamental laws lies mainly in the danger that the legislature will be influenced, by temporary excitement and passions among the people, to adopt oppressive enactments. . . . The object of construction, as applied to a written constitution, *is to give effect to the intent of the people in adopting it.*"

If I could agree with my five associates—who with all the certitude of crystal discernment ascribe "studied and deliberate purposes" to the omission of phrases so obviously implied; if I could believe that the people of this state, in adopting their Constitution, intended that public money should not, without legislative command, find its way to the only official repository created for that purpose, or that agencies inferior in dignity to the departments so carefully established could by failure to deposit nullify the genius of a harmonious purpose; if I could feel that the makers jockied with a joker, but did the work so cleverly that for three-quarters of a century the subtle transaction was not openly suspected,—then, with these assurances, a concurrence might be possible. But, convinced as I am that the delegates of 1874 had attained that mature intellectual stature their handiwork suggests, and that nothing was farther from their thoughts than today's eventuality, I must respectfully dissent.