J. A. GIPSON *v.* CRAWFIS.

5-822                               286 S. W. 2d 336

Opinion delivered January 30, 1956.

904

Kenneth C. Coffelt, for appellant.

Bailey, Warren & Bullion, for appellee.

PAUL WARD, Associate Justice. On May 2, 1955, appellant, for the benefit of himself as a taxpayer and for all taxpayers of Arkansas, instituted in the Chancery Court of Pulaski County Suit No. 102404 against Dr. E. H. Crawfis, Superintendent of the Arkansas State Hospital, K. W. Newman and W. E. Lester, as disbursing officers of the Hospital, and the Standard Accident Insurance Company, as surety for Newman and Lester. The charges against the appellees, as gathered from the pleadings and the admitted facts, may be stated as set out below. Crawfis, as Superintendent of the Hospital, unlawfully drew, and Newman and Lester unlawfully paid to him, money out of the cash funds of the Hospital and the State Treasury, in excess of his salary as prescribed by the Legislature. The prayer was that the defendants (appellees) be required to return the excess payments to the source from which it came and that they be restrained from similar activities in the future.

The excessive payments complained of are of three different kinds, viz:

1. The sum of $1,552.48 paid out of cash funds for moving Dr. Crawfis' household belongings from Cali-

fornia to Little Rock; 2. The sum of $1,947.30 paid out of cash funds for furniture and carpet for the house assigned to Dr. Crawfis by the Hospital [The complaint alleges that Dr. Crawfis has converted said furniture to his own use, but it conclusively appears that he has not and that it belongs to the State], and; 3. The sum of $1,447.67 being the amount paid out of money appropriated by the Legislature for the service of a maid assigned to Dr. Crawfis' home.

For answer to the above charges, the defendants (appellees) admit the above expenditures, but claim they were lawfully made under the provisions of Act 501 of 1953.

The Chairman and Members of the Hospital Board filed an intervention, adopting the defendants' answer, and stating that all said expenditures had been by them first duly considered and then approved.

We will for convenience hereafter refer to the above suit as the "First Case."

On April 18, 1955, a similar suit, No. 102296, had been filed in like manner by appellant against the same Mr. Newman and Mr. Lester. This suit, which we will hereafter refer to as the "Second Case," was by the trial court consolidated and heard with the First Case. The charges in the Second Case, as taken from the pleadings and admitted facts, are hereinafter set out.

1. In 1953 Newman held the position of Assistant Hospital Administrator which the 1953 Legislature created and fixed the salary of $6,500. Later the Hospital Board abolished this office and created a new position, designated as Director of Administration, and fixed the salary at $8,500. Newman entered upon the duties of the new position in February 1954 and held it until some time in October 1954 at the salary of $8,500 — an excess of $1,250 over the salary fixed by the Legislature as stated above. This excess of $1,250 was paid out of the cash funds of the Hospital. The prayer was for judgment against Newman for $1,250, and that he be restrained from drawing further excess salary.

2. Lester began working for the Hospital in January of 1954 as Chief Accountant at a salary of $4,500 as provided by the 1953 Legislature. On June 29, 1953 the Hospital Board created the office of Procurement and Disbursing Officer, and fixed the salary at $5,700. Lester drew this salary as Procurement and Disbursing Officer for one year prior to the filing of this suit, and has therefore drawn an excess in salary of $1,200. This excess was also paid out of the Hospital cash fund. The prayer was the same as in the Newman case.

By way of answer to the charges against him Newman admits drawing the salary of $8,500 for the time alleged but states: the office of Director of Administration was created by specific resolution of the Hospital Board, fixing the salary; that said office contained new and separate duties from any office or position theretofore existing, and; that it was all authorized by Act 127 of 1939. Lester admits drawing the salary of $5,700 as Procurement and Disbursing Officer for the alleged time, but states that the new position and salary were authorized by the Board, all of which was regular and proper.

The Hospital Board intervened in behalf of Newman and Lester, adopting their answers and exhibiting resolutions creating the two new positions or offices and fixing the salaries.

After hearing the testimony the chancellor dismissed appellant's complaint in both cases, and this appeal follows.

There is no material conflict in the testimony introduced in either of the cases, so instead of summarizing it separately we shall refer to it hereafter in the discussion that follows.

FIRST CASE. Appellant's argument for a reversal may be stated as follows: When the Legislature creates an office or position in any state institution, just as Act 501 of 1953 designated the office of Superintendent of the State Hospital and fixed the salary at $12,000, the governing body of that institution has no power to

pay or authorize the payment of a larger salary, and; The payments mentioned heretofore for the benefit of Dr. Crawfis amounted to an increase in his salary. In support of this argument appellant relies on Article 16 Section 4 of the Constitution and on the pronouncements in *Gipson* v. *Ingram*, 215 Ark. 812, 223 S. W. 2d 595. It is unnecessary to discuss the authorities above mentioned because we agree with appellant that when the Legislature designated the office or position of Superintendent of the State Hospital and fixed the salary, the Hospital Board had no right to increase his salary. We do not however agree that the three items complained of above amounted to an increase in Dr. Crawfis' salary. This being true it makes no difference therefore whether some of the items were paid for out of cash funds belonging to the Hospital. The status of an institution's cash fund was clearly stated in the *Ingram* case, supra, which held that such funds need not be paid into the State Treasury and thereafter appropriated by the legislature before they can be expended.

After careful consideration we have concluded that the Hospital Board had the right under the Appropriation Act 501 of 1953 to make the expenditure in each of the three items complained of. Section 2(3) of said Act appropriated $1,143,000 per year for maintenance. Section 3 of the Act states that "maintenance" is limited to include food and housing for the superintendent [along with numerous other employees]. We think the word "housing" must be interpreted to include household furniture and that the word "food" must be interpreted to include prepared food and not merely groceries. Therefore it clearly appears to us that the Board had authority to buy the furniture and carpet for Dr. Crawfis' house which was furnished to him. It is not quite so clear that this could include paying for moving Dr. Crawfis' household effects from California to Little Rock. It seems to follow however that if this had not been done then the Board would have been faced with the necessity of buying additional furnishings for the house. The mere fact that the Legislature entrusted to the Board the responsibility of spending over a million

dollars for maintenance compels the conclusion that it was the intention of the Legislature that the Board would have the right and duty of exercising wide discretion. The record leaves no doubt that the Board wisely exercised said discretion in employing Dr. Crawfis and we think they had considerable discretion in doing what they thought necessary to secure his services. Said Act 501 of 1953 provided for 74 waitresses and fixed the salary of each. The Act did not provide for any "maids." This seems to be the title which appellant has assigned to Ova Young who, it is admitted, was assigned to Dr. Crawfis' home. Undoubtedly she was one of the waitresses provided by the Legislature. Again, we think the Board did not abuse its discretion in assigning Ova Young to Dr. Crawfis' home, since he and his family were entitled to have their food prepared and served. It would be unreasonable to hold that the Legislature, in such instances, has the sole right to specify the exact duties to be performed by each of the numerous employees. That this assignment of Ova Young was not merely a subterfuge to increase Dr. Crawfis' salary is conclusively shown by the fact that she had previously served other superintendents in the same capacity.

Having concluded as we do that the Board was justified, in the exercise of its discretion, in classifying the first two items mentioned above as items of maintenance there can be no question but that the Board could have paid for these items out of the maintenance appropriation. Instead of doing this however they paid said items out of cash funds belonging to the Hospital, and it is contended that they had no right to do so. Support for this contention is sought to be found in the *Ingram* case, supra. We are unable however to find in the *Ingram* case any inhibition against such use of cash funds. The one definite holding in that case, as above stated, was that cash funds could not be used to pay an increase in salaries fixed by the Legislature, and, as heretofore stated, we are in thorough agreement with that holding. Except for this one limitation on the use of cash funds, the *Ingram* case placed no other limitation on the use of such funds. On the other hand the language in that opinion

indicates that the cash fund of any institution may be used for almost unlimited purposes aside from increasing salaries. On page 814 of the Arkansas Reports it shows that Gipson alleged "that the state agencies and institutions are expending cash funds as the governing boards see fit, and without legislative appropriation; . . ." With knowledge of the above allegation the court stated: "There is only one allegation that anything is being done in violation of what the legislature has permitted, and that allegation is that some portions of the cash funds are being used to supplement the salaries . . ." Again this court, in the *Ingram* case, in noting the absence of any provision in our present constitution requiring cash funds to be placed in the State Treasury, said: "Certainly, such omission leaves the legislature of this state free to provide that public money derived as in this case may be deposited as cash funds, for the use of the state agencies and institutions."

In the face of the above clear declarations by this court in regard to the use of cash funds of institutions we think it would lead to a confused situation for us to now hold that such funds could not be used for the two items mentioned above. If we should so hold it would be hard to understand how the governing board of any institution would ever know for what items it could expend cash funds. What rule could the board use to distinguish between what is for maintenance and what is not or when it is safe to use cash funds? As stated in the *Ingram* case, supra, the Legislature has the power to say what disposition shall be made of cash funds belonging to the state institutions, but up until now it has not done so. Until it does it seems to us that much must be left to the discretion of the governing board.

We therefore conclude that the trial court was right in dismissing appellant's complaint in this case and his action in so doing is hereby affirmed.

SECOND CASE. In the case of Newman we may fairly conclude from the record that the Hospital Board acted in all good faith and apparently with good sound business judgment when it abolished two of the positions

created by the Legislature in 1953 carrying a total of $11,000 in salaries and in lieu thereof created the position of Director of Administration with a salary of $8,500. In the case of Lester we are also convinced from the record that the Hospital Board thought it had the legal authority and thought they were acting for the best interest of the institution when it created the new position designated as Procurement and Disbursing Officer and fixed the salary at $5,700. In 1953 the Legislature passed Act 41 sometimes called the Fiscal Code Act. Among other things this Act set up a central purchasing agency for the state. Article 7 Section 3 of that Act no doubt led the Hospital Board to believe that it had the right to designate the purchasing agent for the Hospital.

Notwithstanding the above however we are forced to the conclusion that the Hospital Board did not have the power and authority to establish these positions or offices and designate the salaries. An examination of our Constitution as well as the former decisions of this court compels this conclusion.

Article 16, Section 4, of the Constitution reads as follows:

"The General Assembly shall fix the salaries and fees of all officers in the State, and no greater salary or fee than that fixed by law shall be paid to any officer, employee or other person, or at any rate other than par value; and the number and salaries of the clerks and employees of the different departments of the State shall be fixed by law."

It seems that it would be sufficient in this connection merely to rely on the last sentence of the section above quoted. It says "the number and salaries of the clerks and employees of the different departments of the State shall be fixed by law." It is admitted of course that the salaries of Newman and Lester were not in this instance fixed by law. The first part of the quoted section explains the meaning of "fixed by law." It says that the General Assembly shall fix the salaries and fees.

Also, as we shall later see, this power of the Legislature to create offices or positions and fix salaries cannot be delegated to any person or board.

The portion of the Constitution quoted above has heretofore been construed by this court in harmony with and support of the conclusion we have reached.

In the case of *Nixon* v. *Allen,* 150 Ark. 244, 234 S. W. 45, this court declared unconstitutional portions of Act 264 of 1921 which, among other things, purported to give the Circuit, Chancery and County Judges the power to appoint deputies to certain county offices and fix their compensation. In reaching its conclusion the court quoted Article 16 Section 4 of the Constitution and then made this statement: "The power to fix the salaries and fees of all officers in the State and the number of their clerks and employees and their salaries, is a function, which, within the limits of the constitution, is lodged in the supreme law-making power of the State — the Legislature." After citing authorities the court also said: "The General Assembly cannot delegate this legislative power to any individual, officer, or board." In this same case the court very clearly stated the reason for such a constitutional provision. The court said that it was ". . . intended by the framers of our organic law to forestall, if possible, any extortion, extravagance, or corruption on the part of those entrusted with the administration of public office, and to promote the general welfare by protecting the people from exorbitant taxation in order to meet the necessary burdens of government."

The *Nixon* case, supra, was followed and quoted extensively in the case of *Director of Bureau of Legislative Research* v. *Mackrell,* 212 Ark. 40, 204 S. W. 2d 893. The court there was dealing with an Act of the 1947 Legislature which created the Legislative Council but failed to appropriate money to pay the employees provided for in the Act. It was alleged that the State Board of Fiscal Control was attempting to allocate funds to the Legislative Council to pay the salaries of the employees of that board. Relying largely upon the decision in the

*Nixon* case, supra, the court held that the payment of salaries in this manner would be in violation of Article 16 Section 4 of the Constitution. In speaking of this constitutional provision the court stated that its purpose was ". . . to prevent the expenditure of the people's tax money without having first procured their consent, expressed in legislative enactments . . ."

Under the views above expressed, there is no merit in appellees' contention that the Hospital Board had the right under Act 127 of 1939 and Act 240 of 1933 to create new positions for Newman and Lester and fix their salaries. The pertinent parts of said Act 127 relied on by appellees are now Ark. Stats. Sections 59-226 and 59-227, and the pertinent part of Act 240 is now Ark. Stats. Section 59-208. The first cited section provides that cash funds shall be deposited in a bank designated by the Hospital Board, and the second cited section authorizes the Board to use the cash funds for "maintenance, support and expenses of the State Hospital . . ." The last cited section authorizes the Board to employ ". . . such persons, guards, nurses, physicians, officers, assistants and attendants as may be necessary . . . and fix their compensation . . ."

We do not interpret the above sections as giving the Hospital Board authority to create new positions as was done here. If, however, they should be so interpreted then they would be, as heretofore shown, in conflict with Article 16 Section 4 of the Constitution.

The only remaining question is: Should Newman and Lester be compelled to repay the money received for excess salaries, being $1,250 in the case of Newman and $1,200 in the case of Lester? Our opinion is that this question must be answered in the affirmative.

As heretofore shown the excess payment in each instance was a violation of Article 16 Section 4 of the Constitution. In such cases this court has uniformly held that repayment can be enforced. One of the landmark cases is *Tallman* v. *Lewis*, 124 Ark. 6, 186 S. W. 296. This case was cited with approval and commented on

extensively in the case of *Vick Consolidated School Dist. No. 21* v. *New,* 208 Ark. 874, 187 S. W. 2d 948. In the latter case the school district had paid New who had taught without a license contrary to the provisions of the law, and it was held that he had to repay the amount so received. At page 880 and 881 of the Arkansas Reports the court set forth three classifications where repayments in such instances could or could not be enforced. Under the third classification the court said:

"There are those cases in which an individual has dealt with the district, council, board, or other governmental subdivision *in plain violation of the letter of the statute,* and has received public money under a course of dealings *forbidden by statute.* In those cases the courts have not only refused the individual the *quantum meruit* for his services rendered, but have also allowed recovery by the governmental subdivision of any moneys paid the individual on a contract forbidden by statute." Citing the *Tallman* case, *supra,* and other cases.

The case of *Barber* v. *Edwards,* 200 Ark. 940, 141 S. W. 2d 831, dealt with a fencing district which had been enlarged and the Board of Assessors sought to increase the salary of the pound keeper due to the additional duties which he was forced to perform. In speaking of the legislative act which fixed the original salary the court said: "Section 1 of said Act 290 of 1905 fixed his salary at 'not exceeding $30.00 per month in addition to his fee as now provided by law.' Perhaps his duties were largely increased by reason of the annexation of the new territory in 1936, but his salary is still fixed by said act and may not now be increased by the board without authority of law."

In the Second Case since it appears that Newman's and Lester's excess salaries were paid out of the Hospital cash fund, Newman should be directed by the trial court upon remand to repay into the said fund $1,250, and Lester should be likewise directed to repay the sum of $1,200.

Accordingly the decree of the trial court in the First Case is affirmed, and the decree in the Second Case is reversed and remanded for further action as directed by this opinion.

Chief Justice SEAMSTER and Justices HOLT and ROBINSON dissent in Second case.

J. SEABORN HOLT, J., dissenting in part. I think the decree should be affirmed as to all of the appellees.

At the outset we must keep in mind that we are not dealing with State Funds that have been deposited in the State Treasury and, therefore, would be subject to Legislative control when and if so deposited. In other words, we are dealing with cash funds that have never been deposited in the State Treasury, but are kept in a separate State Hospital Fund. The Legislature, under our recent holding in *Gibson* v. *Ingram*, 215 Ark. 812, 223 S. W. 2d 595, has the power to require all cash funds to be deposited in the State Treasury, but it has not done so as to the cash funds here involved.

Under Ark. Stats. §§ 59-208, 59-226 and 59-227, I think the Hospital Board has the authority to do exactly what it did here. The majority, referring to the provisions of the above sections, point out that § 59-226 provides that cash funds shall be deposited in a bank designated by the Hospital Board, and Section 59-227 authorizes the Board to use the cash funds for maintenance, support, and expenses of the State Hospital. Section 59-208 provides: "The Board may employ, or may authorize the employment of, such persons, guards, nurses, physicians, officers, assistants and attendants as may be necessary for the efficient and economical administration of the hospital, and shall fix their compensation, which shall be payable monthly."

The record reflects that in February 1954 the Hospital Board was faced with the necessity of cutting back its cost of operation in order to meet a declining budget and in its judgment it became necessary to abolish certain positions then in existence and to consolidate and create new positions, consolidating the duties of certain of the

old positions, and were all paid for out of Cash Funds. The State Hospital Board, acting under what it considered to be the best interest of the State Hospital, created the position of Director of Administration and abolished the positions of Assistant Hospital Administrator and Director of Personnel. The salary of the Assistant Hospital Administrator was $6,500 a year and that of the Director of Personnel $4,500 a year, or a total of $11,000 a year. The new position created by the Board contained the duties of both of the above positions, plus additional duties, and the salary was set by the Board of Control at $8,500 a year, paid from Cash Funds, thereby effecting a savings of $2,500 a year, in addition to providing more efficient management. It is significant to note that the new position created by the Board was submitted to the 1955 Legislature and is now contained, on a permanent basis, in the Appropriation Act under the identical title as created by the Board of Control. It is hardly necessary to say that the wisdom and advisability of allowing State Agencies to effect policies of reorganization and retrenchment where possible cannot be seriously questioned. Necessarily these agencies, and particularly the Hospital Board, must and do have a broad discretion.

In the *Gibson* v. *Ingram* case above, we said: "It will be observed that in the quoted provisions from these Constitutions there is the requirement of deposit into the treasury. But when these Constitutions are compared with the present Arkansas Constitution (of 1874), it is clear that our present Constitution requires only that money in the treasury shall not be removed except by legislative appropriation. There is no requirement in the present Arkansas Constitution that all public money shall be paid into the state treasury. The absence of such a provision from our present Constitution appears to have been a studied and deliberate omission. Certainly, such omission leaves the Legislature of this State free to provide that public money derived as in this case may be deposited as cash funds, for use by the state agencies and institutions."

916

In my view there has been no violation here of any statute or constitutional provision of Arkansas.

The Chief Justice and Justice ROBINSON join in this dissent.