REBSAMEN MOTOR COMPANY *v.* PHILLIPS.

5-948                                      289 S. W. 2d 170

Opinion delivered April 2, 1956.

[Rehearing denied April 30, 1956.]

*Spitzberg, Mitchell & Hays,* for appellant.

*Wright, Harrison, Lindsey & Upton,* for appellee.

*A. F. House, amicus curiae.*

J. SEABORN HOLT, Associate Justice. By this suit appellants, for themselves and all others similarly situated, question the constitutionality and validity of Act 182 of the Acts of the 1955 Legislature, §§ 75-1501 — 1506 Ark. Stats. 1947 Sup.

Their complaint contains these allegations: ". . . 2. Plaintiff, Rebsamen Motor Company, is a corporation organized under and existing by virtue of the laws of the State of Arkansas. It is engaged in the business of a motor vehicle dealer in the City of Little Rock, Arkansas; it holds a *bona fide* contract or franchise with the Ford Motor Company, manufacturer of Ford automobiles; it maintains adequate space in one of the buildings in which its business is conducted for the display of new and unused motor vehicles, the repair and servicing of motor vehicles, and the storage of new parts and accessories for motor vehicles. It is also engaged in the businesses of repairing and servicing motor vehicles and the selling of new parts and accessories for motor vehicles. Its principal place of business is located in the City of Little Rock, Arkansas. 3. The plaintiff, R. W. Morris, Jr., is employed as a salesman by the plaintiff, Rebsamen Motor Company . . . Defendants [appellees] are attempting to enforce the provisions of this act which would require the plaintiffs and other persons similarly situated as motor vehicle dealers and motor vehicle salesmen in the State of Arkansas to pay license fees. This act is void in that it violates Article I, Sections 1, 8 and 10; Article IV, Section 2; the Fifth Amendment and the Fourteenth Amendment of the Constitution of the United States; Article II, Sections 2, 3, 7, 8, 13, 18, 21, 22 and 23; . . . of the Constitution of the State of Arkansas. 5. The defendants are threatening to continue the enforcement

of this Act. Unless they are restrained from enforcing the provisions of Act 182, the plaintiffs and others similarly situated as motor vehicle dealers and motor vehicle salesmen in the State of Arkansas will suffer irreparable injury for which they have no adequate remedy at law. 6. Act 182 is void because (1) it is indefinite, vague and ambiguous; (2) the license fees which are charges under its provisions are excessive for fulfilling the purposes of the act; and (3) it is discriminatory in that it requires franchised dealers and their employees to obtain a license and pay a fee, but it does not require non-franchised dealers to either obtain a license or pay a fee." They ask that the act be declared unconstitutional.

Appellees' answer was a general denial of all material allegations. Trial resulted in a decree upholding the constitutionality and validity of the act, in all respects; that its enactment was within the police power of the State of Arkansas; and dismissed appellants' complaint. This appeal followed.

Act 182 attempts to set up a commission of seven members to be appointed by the Governor, one from each of the 6 Congressional Districts, and one from the State at large to be chairman. Among its provisions are the following: "SECTION 1. Necessity for regulation — Legislative finding. The legislature finds and declares that the distribution and sale of motor vehicles in the State of Arkansas vitally affects the general economy of the State and the public interest and the public welfare, and that in order to promote the public interest and the public welfare, and in the exercise of its police power, it is necessary to regulate and to license motor vehicle manufacturers, distributors and dealers doing business in Arkansas, in order to prevent frauds, impositions and other abuses upon its citizens . . . SECTION 2. (b) 'Motor Vehicle Dealer' means any person, firm, association, corporation or trust not excluded by subsection (c) of this Section who sells, solicits or advertises the sale of *new and unused* motor vehicles and holds a *bona fide* contract or franchise in effect with a manufacturer or distributor of the *new or unused*

motor vehicle or vehicles proposed to be dealt in and who maintains adequate space in the building or structure wherein his, its or their established business is conducted for the display of *new and unused* motor vehicles and also provides for the repair and servicing of motor vehicles and the storage of new parts and accessories for the same . . . (d) 'Motor Vehicle Salesman' means any person who is employed as a salesman by a motor vehicle dealer whose duties include the selling or offering for sale of *new and unused motor* vehicles. (e) 'Commission' means the Arkansas Motor Vehicle Commission created by this Act. (f) 'Manufacturer' means any person, firm, association, corporation or trust, resident or nonresident, who manufactures or assembles *new and unused* motor vehicles. (g) 'Distributor' or 'Wholesaler' means any person, firm, association, corporation or trust, resident or nonresident who in whole or in part sells or distributes *new and unused* motor vehicles to motor vehicle dealers, or who maintains distributor representatives. (h) 'Factory Branch' means a branch office maintained by a person, firm, association, corporation or trust who manufactures or assembles motor vehicles for the sale of motor vehicles to distributors, or for the sale of motor vehicles to motor vehicle dealers, or for directing or supervising, in whole or in part, its representatives. (i) 'Distributor Branch' means a branch office similarly maintained by a distributor or wholesaler for the same purposes a factory branch is maintained. (j) 'Factory Representative' means a representative employed by a person, firm, association, corporation or trust who manufactures or assembles motor vehicles, or by a factory branch, for the purpose of making or promoting the sale of his, its or their motor vehicles, or for supervising or contracting his, its or their dealers or prospective dealers. (k) 'Distributor Representative' means a representative similarly employed by a distributor, distributor branch or wholesaler . . .''

Each member was required to execute a bond of $5,000 and was to receive $10.00 per diem each day re-

quired in attending meetings; provided, that such pay shall not exceed $200 per annum for any one person.

"SECTION 3 . . . (d) The Commission shall appoint a qualified person to serve as Executive Secretary thereof, to serve at the pleasure of the commission, and shall fix his salary and shall define and prescribe his duties . . . (f) . . . At the close of each fiscal year hereafter said commission shall file with the Governor and the State Auditor a true and correct report of all fees and charges collected and received by it during the preceding fiscal year and shall at the same time pay into the general revenue fund of the State a sum equal to ten per centum (10%) of the gross fees and charges so collected and received . . . SECTION 4. Licenses. (a) On or after July 1, 1955, it shall be unlawful and constitute a misdemeanor for any person, firm, association, corporation or trust to engage in business as, or serve in the capacity of, or act as a motor vehicle dealer, or motor vehicle salesman, or manufacturer, distributor or wholesaler of motor vehicles, or factory branch, distributor branch, or factory representative or distributor representative, as such, in this State without first obtaining a license therefor as provided in this Section; . . . (c) . . . (1) For each Manufacturer, Distributor or Wholesaler, Factory Branch or Distributor Branch, One Hundred Dollars ($100.00). (2) For each Motor Vehicle Dealer, Factory Representative or Distributor Representative, Twenty-Five Dollars ($25.00). (3) For each Motor Vehicle Salesman, Five Dollars ($5.00) . . ."

Section 5 sets out numerous grounds on which the Commission may deny an application for a license or revoke or suspend a license already granted, among these grounds are: "(c) For any willful failure to comply with any provision of this Act or with any provision of this Act or with any rule or regulation adopted and promulgated by the Commission under authority vested in it by this Act . . . (g) Being a Manufacturer of motor vehicles, Distributor, Wholesaler, Distributor Branch or Factory Branch, or officer, agent or other representative thereof, who has either induced or

coerced or attempted to induce or coerce any Motor Vehicle Dealer: (1) To accept delivery of any motor vehicle or vehicles, parts or accessories therefor, or any other commodity or commodities which shall not have been ordered by said Motor Vehicle Dealer; (2) To use automobile or truck registration figures, lists or any analysis therefrom; likewise the use of any competitive sales figures of cars, trucks, parts or accessories, as a basis of conducting business; (3) To order or accept delivery of any motor vehicle with special features, appliances, accessories or equipment not included in the list price of said motor vehicles as publicly advertised by the manufacturer thereof; (4) To order for any person any parts, accessories, equipment, machinery, tools, appliances or any commodity whatsoever. (h) Being a Manufacturer of Motor Vehicles, Distributor, Wholesaler, Distributor Branch or Factory Branch or officer, agent or other representative thereof, who: (1) Has refused to deliver to any Motor Vehicle Dealer having a franchise or contractual arrangement for the retail sale of *new and unused* motor vehicles sold or distributed by such Manufacturer, Distributor, Wholesaler, Distributor Branch or Factory Branch, any motor vehicle, publicly advertised for immediate delivery, within sixty (60) days after such dealer's order shall have been received; (2) Has attempted to induce or coerce, or has induced or coerced, any Motor Vehicle Dealer to enter into any agreement with such Manufacturer, Distributor, Wholesaler, Distributor Branch or Factory Branch or representative thereof or to do any other act unfair to said dealer by threatening to cancel any franchise or contractual agreement existing between such manufacturer, distributor, wholesaler, distributor branch or factory branch and said dealer; (3) Has unfairly, without due regard to the equities of said dealer and without just provocation, canceled the franchise of any Motor Vehicle Dealer. The non-renewal of a franchise or selling agreement without just provocation or cause shall be deemed an evasion of this paragraph and shall constitute an unfair cancellation; (4) Has refused to extend to a Motor Vehicle Dealer the privilege of determining

the mode or manner of available transportation facility which said dealer desired to be used or employed in making deliveries of *new motor vehicles* to him or it." . . .

Legislative acts are presumed to be constitutional and valid until the contrary is shown, and the burden is on those who may question their constitutionality. We have concluded that appellants have met that burden here and that the trial court erred in upholding the constitutionality of Act 182.

In reading and considering this act in its entirety it is readily apparent that its purposes and effect, and under its terms, appellant, along with his salesmen and other franchised dealers and their salesmen, were regulated and required to pay a license fee for the privilege of engaging in the business of selling *new and unused motor vehicles* and on failure to pay the tax to be subject to prosecution on a misdemeanor charge, while their competitors in the same community, who are not franchised, but who may deal in both new and used cars, along with their salesmen, were not regulated or required to pay the license fee and could operate without penalty, even though they were engaged in the same business. To hold that under its police power the legislature could enact such legislation, exempting from the tax automobile dealers engaged in *new and used* cars from paying the license fee, and at the same time requiring franchised dealers in the same community, who deal only in *new and unused cars* to pay the tax, is clearly, we think, an arbitrary classification and in conflict with Section 18 Article 2 of the Constitution of the State of Arkansas which provides that: "The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens." It also contravenes the Fourteenth Amendment to the Constitution of the United States which prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws."

"The principle of equality and uniformity requires that license or privilege taxes be imposed equally and impartially on all persons pursuing the same avocation or exercising the same privileges, . . . the legislature may not, under the pretense of a license fee or tax, impose unequal taxes on persons similarly situated." 53 C. J. S., Licenses, Sec. 22(a), pp. 533-4.

"It has been held . . . that an act or ordinance is unconstitutional if it arbitrarily and unreasonably discriminates between different modes of conducting the same business unless there is something in the one mode which makes it more dangerous to the public." 53 C. J. S., Licenses, Sec. 22(b) (2), p. 544.

The regulation of the sale of motor vehicles under the state's police power to prevent fraud and to promote the general public welfare, we think, is a proper subject for legislative action, however, the Legislature, under the guise of regulation, may not indulge in what in effect would be arbitrary price fixing or the interference with lawful competition.

This court in *Ex Parte Deeds*, 75 Ark. 542, 87 S. W. 1030, in striking down Act 136 of the Legislature of 1901, the purposes of which were similar in effect to Act 182 here, said: " . . . Reading the act literally, it pronounces a penalty against 'any person, either as owner, manufacturer or agent,' who, without having first procured a license, 'shall travel over or through any county and peddle or sell any lightning rod, steel stove range, clock, pump, buggy, carriage and vehicles, or either of said articles,' but provides that the same 'shall not apply to any resident merchant in said county.' In other words, it permits 'any resident merchant in said county,' but no other person, to 'travel over and through any county and peddle or sell' the articles named without license so to do. It therefore falls clearly within that clause of the Fourteenth Amendment to the Federal Constitution, which prohibits a State from denying to 'any person within its jurisdiction the equal protection of the laws,' and is also in conflict with Section 18 of Article 2 of the Constitution of the State,

154

which provides that 'the General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens.' . . . The Supreme Court of the United States in *Connelly* v. *Union Sewer Pipe Co.,* supra, [184 U. S. 540], said: 'In prescribing regulations for the conduct of trade, it cannot divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. It is one thing to exert the power of taxation so as to meet the expenses of government, and at the same time, indirectly, to build up or protect particular interests or industries. It is quite a different thing for the State, under its general police power, to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce. Such a statute is not a legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates.' ''

Appellees say that acts similar to Act 182 here are in force in many other states and none found to be invalid. From our somewhat limited search we have been unable to find any statute similar, in effect, to Act 182 in any other state which has been declared constitutional and upheld. Appellees have pointed to none. We have, however, found that Nebraska has a statute similar, in effect, to Act 182 and in construing the provisions of that statute the Supreme Court of that state, in *Nelsen* v. *Tilley,* 137 Neb. 327, 289 N. W. 388, 126 A. L. R. 729, (1939), held: ''A provision in regulatory statute limiting issuance of motor vehicle dealer's license for sale of new automobiles to persons enfranchised by manufacturers of new motor vehicles, is an unlawful restriction on the right of a person to adopt and follow a lawful industrial pursuit, and contravenes the Four-

teenth Amendment to the Federal Constitution and the sections of the State Constitution providing that all persons should have equal rights, guaranteeing due process of law, prohibiting grant of special privileges or immunities, and forbidding discrimination between citizens of the United States.''

We further point out that sub-division (d) Section 3 above which provides; ''The commission shall appoint a qualified person to serve as Executive Secretary thereof, to serve at the pleasure of the commission, and shall fix his salary, etc.'' . . . is clearly an attempt by the Legislature to delegate this power to the commission. This power to delegate is denied the Legislature under Article 16, Section 4, of our Constitution which provides: ''The General Assembly shall fix the salaries and fees of all officers in the State, and no greater salary or fee than that fixed by law shall be paid to any officer, employee or other person, or at any rate other than par value; and the number and salaries of the clerks and employees of the different departments of the State shall be fixed by law.'' See our recent case *Gipson* v. *Crawfis*, 225 Ark. 903, 286 S. W. 2d 336.

Considering this Act 182 in its entirety, and finding all of its material provisions, which were intended to effectuate its purposes, to contravene provisions of both our State and Federal Constitutions, we hold it unconstitutional and invalid. Accordingly, the decree is reversed and the cause remanded with directions to enter a decree consistent with this opinion.

The Chief Justice and Mr. Justice WARD dissent. Justice GEORGE ROSE SMITH not participating.

PAUL WARD, Associate Justice (dissenting). I find myself unable to agree with the majority opinion herein which holds Act 182 of 1955, relating to the distribution and sale of motor vehicles, unconstitutional. The majority opinion, as I understand it, assigns three reasons or grounds for the conclusion reached. They are: (a) Act 182 makes an arbitrary and therefore an unconstitutional classification; (b) A similar act was held unconstitutional

by the Supreme Court of Nebraska, and; (c) Act 182 attempts an illegal delegation of legislative power to the Commission. I shall discuss the above reasons or grounds in the order named.

(a)    The majority find that the legislature has no constitutional right to require a license fee from a franchised dealer who deals in new and used cars, and allow a used car dealer to sell new and used cars without having to pay any license fee. It seems to me that this view overlooks entirely the main features and main purpose of said Act 182. The act itself is rather lengthy and much of it is devoted to definitions and setting up the Commission and the rules and regulations governing it. It would serve no useful purpose to set out the provision of the act at any length because, as I understand the act and its purpose, the real gist of the enactment revolves around Section 5(g)(1). In effect this portion of the act is designed to prevent an automobile manufacturing company from forcing a local dealer in this state to accept and pay for more automobiles than the dealer orders, or can dispose of at the price at which he is required to sell them. It is very plain not only from the act but from common knowledge that this situation just described could exist only between a manufacturer and its authorized dealers. Consequently there is no occasion, and the act makes no attempt, to regulate used car dealers or ''bootleg'' new car dealers. As a matter of fact it seems clear to me that if this act is allowed to stand and its provisions are enforced there will be no more ''bootleg'' dealers in new cars.

The majority opinion has not discussed the purposes of the act or the evils which it is designed to eliminate, and therefore there is no point in attempting to show that there is a necessity for regulations of the kind here involved for the protection of the general economy and public welfare as set forth in Section 1 of the act.

The fact that many other states have enacted laws very similar to Act 182 and some have gone unchallenged for 15 years or more is itself a reason why this court

should not strike down this act unless it clearly appears to be unconstitutional. The law is well settled that acts of the legislature are presumed to be constitutional and every reasonable intendment to that end should be indulged.

The following states have enactments containing the same meaning and almost the same wording as Section 5(g)(1) referred to above, see: Wisconsin Stats., 1953, Chapter 218.01 et seq. and particularly subparagraph 15 at page 2771; West's Louisiana Stats. Annotated, Vol. 18, Sec. 32:1255(8)(b) at page 100; Colorado Rev. Stats. 1953, Section 13-11-14-(9)(a), at page 202; Code of Virginia, Vol. 7, Chapter 7, Article 3, Section 46-534(1) at page 171; Florida Stats., Chapter 320, Section 64(5); Tennessee Code Annotated, Vol. 10, Sec. 59-1714(g)(1); 47 Oklahoma Stats. Annotated, Section 565(g)(1) at page 386, and; Public Laws of Rhode Island 1949-50, Chapter 2595, Article VIII, Section 2(5), at page 1255. My limited investigation reveals that several other states have laws somewhat similar in purpose to Act 182. A few of which are Iowa, South Dakota, Michigan, Ohio and Mississippi.

While some of the regulatory acts by other states have been in force for more than 15 years no decision has been called to my attention and I have been unable to find one which has directly passed upon the constitutionality of the main features of Act 182. In the case of *Kuhl Motor Co.* v. *Ford Motor Co.*, 270 Wis. 488, 71 N. W. 2d 420, the Supreme Court upheld appellee's right to cancel a contract with its dealer, appellant. It did so upon the ground that the contract giving the right of cancellation was entered into before the Motor Vehicle Act was passed, which act had the same provision in it that is in Act 182. The Motor Vehicle Act was discussed at length and there is every indication that the Wisconsin Court considered the act constitutional, but did not think it should impair an existing contract. One of the judges dissented on the point above mentioned but no judge suggested that the act was unconstitutional as to future contracts.

(b)    The majority quote a headnote from the case of *Nelsen, et al.* v. *Tilley,* 137 Neb. 327, 289 N. W. 388 (1939),

leaving the impression, perhaps, that the Supreme Court of Nebraska has held unconstitutional an act like the one here under consideration. A careful reading of the decision in that case justifies no such impression. It is true that in the Nebraska statute there is the same language as that found in Act 182 and referred to particularly as Section 5(g)(1) noted above. If may be significant that the Nebraska Court found no fault with this part of the act. The court did however find objections, as shown at page 392, to certain language in the act which is not found in Act 182. That language limited a dealer to selling only the kind of an automobile that his license specified.

(c) The majority opinion concludes that the language in Section 3(d) constitutes an unlawful delegation of legislative power to the Commission to employ and pay a secretary and necessary clerical help. The expense for this help is to be paid out of the fees provided for in the act, and is not an attempt to expend state money without an appropriation. Such procedure is not at all unusual. When the legislature created the Licensing Board for Contractors it provided in Ark. Stats. § 71-706 that "The Board shall be further empowered to employ an Assistant Secretary . . . and whose salary shall not exceed $1,800 per year." In the act regulating real estate brokers and salesmen it is provided, Ark. Stats. § 71-603(f) that from the fees collected the Board shall pay all incident expenses including not to exceed $5.00 a day to an examiner. Other instances of similar legislation could be cited and I know of no decision by this court holding any of them unconstitutional. The payment of expenses provided for in Act 182 are merely incidental to and necessary for the effective operation of the Commission which it creates. These provisions in no way violate our holding in *Gipson* v. *Crawfis*, 225 Ark. 903, 286 S. W. 2d 336, relied on by the majority.

Chief Justice SEAMSTER joins in this dissent.