Martin BORCHERT and Virgil FLETCHER v.
Bob K. SCOTT et al

5-5293                                    460 S. W. 2d 28

Supplemental Opinion on rehearing delivered
October 19, 1970

[Rehearing denied November 23, 1970.]

C. E. Blackburn, for appellants.

*Joe Purcell,* Attorney General; *Mike Wilson,* Asst. Atty. Gen., for appellees.

J. FRED JONES, Justice. When this case was before us on direct appeal we held the Documentary Tax Stamp Act, being Act 239 of 1969, unconstitutional and void under Amendment 20 to the Constitution of Arkansas. *Borchert* v. *Scott, et al,* 248 Ark. 1041, 460 S. W. 2d 28. We have again considered the case on rehearing and have concluded that the Act is severable and that portions of it are constitutional and valid. In reappraising the intent of the legislature in enacting Act 239, we conclude that we cannot say the legislature would not have passed Act 239 without § 6 or subsections (b), (2) and (3) as written. As was said in *Levy* v. *Albright,* 204 Ark. 657, 163 S. W. 2d 529, and repeated in *Faubus, Governor* v. *Kinney,* 239 Ark. 443, 386 S. W. 2d 887:

> "An act may be unconstitutional in part and yet be valid as to the remainder. Many cases so hold, and the following quotation from Cooley's Constitutional Limitations appearing in the case of *Oliver* v. *Southern Trust Co.,* 138 Ark. 381, 211 S. W. 77, has been many times approved by this court: '. . . Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in the subject matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the Legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand, though the last fall. The point is not whether they are contained in the same section; for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that

which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether the good and bad parts of the statute are capable of being separated, within the meaning of this rule. If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mututally connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.' Cooley's Constitutional Limitations, 6th ed., p. 210. This rule has been followed in innumerable cases in the various courts, and by this court in the following cases: *L. R. & Ft. Smith Rd. Co.* v. *Worthen,* 46 Ark. 312; *State* v. *Marsh,* 37 Ark. 356; *State* v. *Deschamp,* 53 Ark. 490, 14 S. W. 653; *Cribbs* v. *Benedict,* 64 Ark. 555, 44 S. W. 707; *Wells Fargo & Co., Express* v. *Crawford County,* 63 Ark. 576, 40 S. W. 710, 37 L. R. A. 371."

Upon reconsideration we conclude that the primary intent of the legislature was to raise funds for the financing and maintenance of the County Aid Fund, the Arkansas Children's Colony and the state parks; and that the Act is severable in the purpose of its enactment and in the method of distribution of the funds collected under its provisions to the purposes intended.

We now turn to the text of Act 239 and the constitutional provisions we must consider; and for reasons that will appear obvious, we copy the entire Act as follows:

## ACT 239

"AN ACT to Impose a Tax on the Transfer of Real Property; to Provide for Penalties for Failure to Comply With This Act; and for Other Purposes. *Be It Enacted by the General Assembly of the State of Arkansas:*

SECTION 1. There is hereby levied on each deed, instrument, or writing by which any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction when the consideration for the interest or property conveyed exceeds One Hundred ($100.00) Dollars, a tax at the rate of One Dollar and Fifty Cents ($1.50) for each Five Hundred ($500.00) Dollars, or fractional part thereof.

SECTION 2. The tax imposed by this Act shall not apply to transfers of the following:

(a) Transfers to the United States, the State of Arkansas, or any of the instrumentalities, agencies, or political subdivisions thereof;

(b) Any instrument or writing given solely to secure a debt;

(c) Any instrument solely for the purpose of correcting or replacing an instrument that has been previously recorded with full payment of tax having been paid at the time of the previous recordation;

(d) Instruments conveying land sold for delinquent taxes.

SECTION 3. The tax levied by this Act applies at the time of transfer and shall be computed on the basis of the consideration for the real estate transferred.

SECTION 4. The County Recorder of Deeds shall not record any instrument evidencing a transfer subject to this Act unless the instrument shall have affixed thereto a documentary stamp or stamps evidencing the full payment of such tax. The County Recorder of Deeds shall, at the time of filing of such instrument, cancel all documentary stamps affixed to such instrument so that such stamps may never be used again.

SECTION 5. The Commissioner of Revenues shall design such documentary stamps in appropriate denominations and shall make the same available for purchase at Revenue Department Offices throughout the State.

SECTION 6. All revenues derived from the tax levied by this Act shall be paid over to the Commissioner of Revenues and shall be deposited in one or more banks selected by him and from time to time withdrawn from such banks in the proportions indicated for use for the following purposes;

(a) An amount not exceeding three per cent (3%) of such deposits for payment of the expenses of the Commissioner of Revenues in administering the provisions of this Act, including the costs of designing and printing the documentary stamps, the preparation and printing of information material and of any regulations which he may promulgate with respect to the use of such stamps and their safekeeping, and for reimbursing the State Treasury for any such expenses of administration hereunder which were paid by the use of State-appropriated funds.

(b) The remainder thereof, but not less than ninety-seven per cent (97%) shall be deposited by the Commissioner of Revenues as follows:

(1) Twenty per cent (20%) shall be deposited by the Commissioner of Revenues in the State Treas-

ury and credited to the County Aid Fund and distributed at the end of each month to the respective counties from which the revenues originated.

(2) Forty per cent (40%) thereof to the Arkansas Children's Colony Board (the 'Colony Board'). Funds so remitted to the Colony Board are hereby specifically declared to be cash funds and shall not be deposited in the State Treasury but shall be deposited in trust in a bank or banks in this State, as the Colony Board may from time to time select and used by the Colony Board, as it shall determine, to operate, maintain, develop and improve institutional and community facilities and services for the mentally retarded, and all or any part may be pledged to and used for the payment of revenue bonds issued by the Colony Board pursuant to Act 186 of 1963, as and to the same extent as the charges referred in Section 7 of Act 186 of 1963. So long as any revenue bonds are outstanding, to the payment of which revenues derived from the tax levied by this Act are pledged, the tax levied by this Act shall continue to be collected and the revenues derived therefrom shall continue to be deposited as provided in this Act and to be pledged to and used for the payment of the outstanding bonds, principal and interest, until the outstanding bonds are fully paid or adequate provision made therefor; and

(3) Forty per cent (40%) thereof to the State Parks, Recreation and Travel Commission of the State of Arkansas (the 'Commission'). Funds so remitted to the Commission are hereby specifically declared to be cash funds and shall not be deposited in the State Treasury but shall de deposited in trust in a bank or banks in this State as the Commission may select, and used by the Commission as it shall determine, to operate, maintain, develop and improve the Public Parks System of the State, and all or any part may be pledged and used for the payment of revenue bonds issued by the Commission pursuant to Act No. 539 of 1953, as amended, as and to

the same extent as revenues derived from the properties and equipment of the State Parks System. So long as any revenue bonds are outstanding, to the payment of which revenues derived from the tax levied by this Act are pledged, the tax levied by this Act shall continue to be collected and the revenues derived therefrom shall continue to be deposited as provided in this Act and to be pledged to and used for the payment of the outstanding bonds, principal and interest, until the outstanding bonds are fully paid or adequate provision made therefor.

SECTION 7. (a) The enforcement of the provisions of this Act shall be the responsibility of the Commissioner of Revenues of the State of Arkansas, under regulations to be promulgated by him.

(b) The buyer in a transaction involving the transfer of title to real estate shall be liable for the tax levied by this Act and if he shall fail to pay the tax and affix the stamps as herein required, he shall be required to pay the tax and in addition shall be subject to a penalty of 50% thereof. Any person filing a deed for record, who knowingly, wilfully, and fraudulently files the same in violation of the provisions of this Act shall, upon conviction thereof, in addition to the penalties provided herein, be subject to a fine of not less than Fifty Dollars ($50.00) nor more than One Hundred Dollars ($100.00).

SECTION 8. 'Consideration' means the amount of full actual consideration paid or to be paid for the property conveyed, including the amount of any purchase-money encumbrance executed by the purchaser.

SECTION 9. This Act shall be in full force and effect as of July 1, 1969.

APPROVED:  March 12, 1969."

Article 16, § 11 of the Constitution provides as follows:

"No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same; and no moneys arising from a tax levied for one purpose shall be used for any other purpose."

Section 12 of the same Article provides:

"No money shall be paid out of the treasury until the same shall have been appropriated by law, and then only in accordance with said appropriation."

Article 5, § 29 of the State Constitution provides:

"No money shall be drawn from the treasury in pursuance of specific appropriation made by law, the purpose of which shall be distinctly stated in the bill, and the maximum amount which may be drawn shall be specified in dollars and cents; and no appropriations shall be for a longer period than two years."

Amendment 20 of the State Constitution is as follows:

"Except for the purpose of refunding the existing outstanding indebtedness of the State and for assuming and refunding valid outstanding road improvement district bonds, the State of Arkansas · shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the State voting on the question at a general election or at a special election called for that purpose.

This Amendment to the Constitution of Arkansas shall be self-executing and require no enabling act, but shall take and have full force and effect im-

mediately upon its adoption by the electors of the State."

The chancellor held the Act valid and the appellant, Martin Borchert, relies on the following points for reversal:

I

"The issuance of bonds provided for in Act 239 without prior approval of the electors of the state violates Article 16, Section 1, as amended by Amendment No. 13, of the Arkansas Constitution and Amendment No. 20 to the Arkansas Constitution.

II

The pledge of revenues provided for in Act 239 violates Article 5, Section 29, and Article 16, Section 12, of the Arkansas Constitution.

III

The tax imposed by Act 239 violates Article 16, Section 5, and Article 16, Section 6, of the Arkansas Constitution.

IV

The tax imposed by Act 239 is unequal, arbitrary and discriminatory and, therefore, in violation of Article 2, Section 18, of the Arkansas Constitution.

V

The tax imposed by Act 239 is an ad valorem tax levied upon property by the State and, therefore, violates Amendment No. 47 to the Arkansas Constitution.

VI

Act 239 does not authorize the appellee members of

the State Parks, Recreation & Travel Commission of the State of Arkansas to issue revenue bonds and to pledge to the payment of those revenue bonds revenues derived from the tax imposed by Act 239."

The appellant-intervener, Virgil Fletcher, has designated additional points for reversal, as follows:

I

"Act No. 239 of 1969 violates Amendment No. 20 to the Constitution of the State of Arkansas.

II

The effect of Act 239 makes possible the complete destruction of the orderly financial program of the state which Amendment 20 was intended to preserve.

III

Act No. 239 in its entirety must fail because in part it violates Amendment 20 and the provisions are not severable.

IV

Act No. 239 attempts to do indirectly what is prohibited from being done directly and is therefore invalid.

V

Act No. 239 denies to the electors of the State of Arkansas their right of suffrage to pass upon the pledge of state revenues for the payment of bonds."

We agree with the appellants that the bond provisions of the Act are void. It may be argued that the bonds authorized under Act 239 are not to be issued by the State of Arkansas and, therefore, not within the prohibition of Amendment 20. But the bond provisions of Act 239 are nullified by their own content. As to the

40% allocation to the Children's Colony Board, § 6 (b) (2) of the Act provides:

> "[A]ll or any part may be pledged to and used for the payment of revenue bonds issued by the Colony Board pursuant to Act 186 of 1963, as and to the same extent as the charges referred to in Section 7 of Act 186 of 1963."

Act 186 of 1963 referred to in Section 6 (b) (2) provides that, "bonds issued under the provisions of this act shall be general obligations only of the Board, and in no event shall they constitute an indebtedness for which the faith and credit of the State of Arkansas *or any of its revenues are pledged.* . . (Emphasis supplied). The bond provision in § 6 (b) (2) is null and void if the revenues it attempts to pledge are *state revenues,* and we hold that they obviously are. Act 539 of 1953 referred to in § (b) (3) has to do with the condemnation and purchase of property adjacent to the Negro Blind and Deaf School and does not relate to, or even mention, the issuance of bonds at all. It is obvious, therefore, from the only wording in § 6 (b) (2) and (3) pertaining to the issuance of bonds, that the authorization for the issuance of bonds in both subsections is void.

Amendment No. 20 has been before this Court in a number of cases. See *Miles* v. *Gordon,* 234 Ark. 525, 353 S. W. 2d 157 (1962); *Holmes* v. *Cheney,* 234 Ark. 503, 352 S. W. 2d 943 (1962) and *McArthur* v. *Smallwood,* 225 Ark. 328, 281 S. W. 2d 428 (1955). In each case thus far decided, where agencies were authorized to pledge revenues to the payment of bonds, we have been careful to point out that the revenue source involved was not taxes. In the *McArthur* case, *supra,* we pointed out that the funds there involved were special funds not otherwise available for the general purposes of the state.

The distinction between "cash funds" and "taxes" as public revenues was made in *Gipson* v. *Ingram,* 215 Ark. 812, 223 S. W. 2d 595 (1949). There the sole issue was whether a legislative appropriation, pursuant to

Article 5, § 29, was a prerequisite to payment by an agency from an accumulated cash fund, derived from various sources such as student fees, dormitory charges, etc. We held that no appropriation was necessary after determining that no part of the funds were derived from taxes.

It is suggested that the act here involved does not levy a tax, even though the act consistently refers to the stamps as a tax and notwithstanding that it in effect constitutes a three per cent excise upon the sale price of all real estate. We find no merit in the suggestion. Neither do we accept the appellants' assertion that the legislature's classification of the revenues as "cash funds" is conclusive under the authority of *McArthur* v. *Smallwood, supra.* That same decision makes plain that a determination of whether an act violates Amendment 20 by pledging the faith and credit of the state is one of substance for the court even though the act contains an express provision to the contrary. We hold that the levy under Act 239 is a tax, and that the proceeds therefrom are state revenues subject to the prohibitions in Amendment 20, as well as Act 186 of 1963 and Act 399 of 1953.

Appellant Borchert, under his point III, argues that the tax imposed under Act 239 violates Article 16, §§ 5 and 6 of the Constitution. These sections of the Constitution have to do with *property* taxes. The tax levided by Act 239 is not an ad valorem tax levied on property, it is not a tax on property at all. An excise tax is defined in Black's Law Dictionary as follows:

"An inland imposition paid sometimes upon the consumption of the commodity, and frequently upon the retail sale."

The tax levied by Act 239 is levied on property transfers and is in the nature of a sales tax levied on the sale of real property. It is in the form of an excise tax and not a property tax.

In *Wiseman* v. *Phillips,* 191 Ark. 63, 84 S. W. 2d 91, the Arkansas Emergency Retail Sales Tax Law, Act 233 of 1935, was under attack as being in violation of Article 16, § 5, of the Constitution, and in that case this court said:

> "Decisions of courts of other States generally hold that similar provisions of their Constitutions for equality and uniformity apply only to taxes on property, and not to excises and privileges. In 26 R. C. L., p. 225, it is said: 'It is generally held that a constitutional provision requiring taxation to be equal and uniform applies only to taxes on polls and property, and has no reference whatever to excises.' To the same effect see 61 C. J., p. 106. Such has been the rule in this State since the decision in *State* v. *Handlin,* 100 Ark. 175, 139 S. W. 1112, which sustained the inheritance tax as a tax on a privilege.

> . . . [W]e are bound to conclude that the tax levied by said Act 233 is an excise tax or privilege tax that is not prohibited. Whether it is such a tax on the purchase or the sale, or the right to acquire personal property for use of consumption, or whether it is a tax on the transaction, it is unnecessary to determine. Whatever it is and by whatever name it may be called, its character must be determined by its incidents, and its validity must be measured by the Constitution under the rules stated."

Under appellant Borchert's point IV he cites *Davies* v. *Hot Springs,* 141 Ark. 521, 217 S. W. 769, in support of his argument that the tax imposed by Act 239 is unequal, arbitrary and discriminatory and in violation of Article 2, § 18, of the Constitution, which is as follows:

> "The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens."

In *Davies*, a municipal ordinance which levied an occupational privilege tax on attorneys and physicians on the basis of the length of time they had been in practice, was held without and beyond legislative authority. However, the appellant's argument under his point IV is answered in *Davis* in the following language:

> "It is claimed, however, that the statute provides an unjust and discriminatory method of classification which renders it void. In consideration of that question it must be remembered that the provision of the Constitution with respect to uniformity in taxation applies only to a property tax, and has no reference to the taxation of privileges. *Fort Smith v. Scruggs, supra.* The State having the power to tax privileges, it necessarily follows that it may make its own selection of the privileges to be taxed, and the omission from the list to be taxed of any number of occupations does not constitute an unlawful discrimination. *Ex parte Byles*, 93 Ark. 612. The only restriction which the law imposes on the exercise of the power is that there shall not be a discrimination between persons in like situations and pursuing the same class of occupation. *Waters-Pierce Oil Co.* v. *Hot Springs*, 85 Ark. 509."

In *Fort Smith* v. *Scruggs*, 70 Ark. 549, 69 S. W. 679, at p. 555, we said:

> ". . . [T]he rule of equality only requires that the tax shall be collected impartially of all persons in similar circumstances; and this statute applies equally to all persons of the class taxed."

Appellant Borchert's point V has already been disposed of by our holding under point III, that the tax levied under Act 239 is in the nature of an excise and not a property tax. An ad valorem tax is a tax on the value of property. (Black's Law Dictionary). Act 239 levied a 3% tax on the *sale* of real property, not on the property or its value; the amount of the tax is based on the consideration or price received in the transaction and not on the value of the property.

Appellant Borchert's point VI and appellant-intervenor Fletcher's points I and II, as well as his points IV and V, are rendered moot by what we have already said.

Appellant Fletcher's point III has given us the most difficulty on rehearing, but we conclude it is without merit. We hold that Act 239 is severable. *Levy* v. *Albright, supra.* Section 1 of the Act simply levies an excise tax on the sale of real property and is not prohibited by the Constitution. In *Wiseman* v. *Phillips, supra,* we said:

> "In determining whether an act of the General Assembly is constitutional, we must bear in mind that that instrument is not a 'grant of enumerated powers of the Legislature, not an enabling, but a restraining act, and that the Legislature has the undoubted power to make the written laws of the State, unless it is expressly, or by necessary implication, prohibited from so doing by the Constitution; that the act is presumed to be valid, and that all doubt of its validity must be resolved in favor of the act. *Bush* v. *Martineau,* 174 Ark. 215, 295 S. W. 9.''

Sections 1, 2, 3, 4 and 5 of Act 239 are valid in the light of what we have already said. Section 6 simply makes the Commissioner of Revenues the collector of the tax and provides that he shall deposit the amounts collected in one or more banks selected by him, such amounts to be withdrawn from time to time in the amounts and for the purposes set out in the allocation. So where does all this leave Act 239 as affects the tax funds collected and to be collected thereunder?

Under § 6 the funds deposited in one or more banks by the Commissioner of Revenues are left subject to being withdrawn in the proportions and for the purposes set out in the Act. Under subsection 6 (a), an amount not exceeding three per cent of such deposits is left subject to use in the payment of the expenses of the Commissioner of Revenues in administering the provisions of the Act, as set out therein; and for reim-

bursing the state treasury for any such expenses of administration under the Act which were paid by the use of state-appropriated funds.

Under § 6 subsection (b) (1) twenty per cent is to be deposited by the Commissioner of Revenues in the state treasury and credited to the County Aid Fund and distributed at the end of each month to the respective counties from which the revenues originated.

It is in the authorized *use* of the funds under § 6, subsections (b) (2) and (3), and not in the *purpose* intended by the legislature in levying the tax, where Act 239 collides with the Constitution. It is at this point where the Act must be severed, and the levy permitted to pass and stand for the intended purpose; and where that part of the announced use for the funding of bonds, must fall at the constitutional bar, so we now examine these subsections for a determination of their status following the severance.

Under subsection (2) of § 6, 40% of the amounts so deposited in banks by the Commissioner of Revenues under § 6, is left subject to being withdrawn from time to time, and deposited in a bank or banks in this state for use by the Colony Board to operate, maintain, develop and improve institutional and community facilities and services for the mentally retarded. Under subsection (3), 40% of the amounts so deposited in banks by the Commissioner of Revenues under § 6 is left subject to being withdrawn from time to time and deposited in trust in a bank or banks of this state for use by the Commission to operate, maintain, develop and improve the public parks system of the state.

We now come to a crucial question in this opinion which we conclude must be answered now or later. The question is whether the funds "subject to being withdrawn from time to time" under subsections (2) and (3) may be withdrawn, redeposited and used *now* for the announced purposes, or must they *remain* "subject" to withdrawal and use pending additional directions from the legislature? Section 12 of Article 16 and section 29 of Article 5 of the Constitution, supra, require an

appropriation for the *withdrawal* of money from the state treasury. Part of the difficulty here lies in the fact that unlike many of the states, our Constitution has no provision *requiring* that state tax money be deposited in the state treasury, and our Constitution is silent as to the disposition of state tax funds that have never been paid into the treasury. Many of our revenue raising acts do require that the money be paid into the state treasury and many others, including Act 239 (with slight exception)* do not. So the question is, since the legislature did not direct the revenues derived from Act 239 into the state treasury, as the legislature had a right to do in the absence of a constitutional requirement to the contrary, are the funds collected under Act 239 subject to use or disbursement without the necessity of additional legislative direction or without being appropriated under the requirements of § 29, Article 5, supra?

This court has come close to deciding this precise point in several cases but has never completely done so. In *McArthur* v. *Smallwood, supra,* Act 375 of 1955 was attacked as in violation of Article 5, § 29 and Article 16, § 12 of the Constitution. The opponents of the measure cited a number of cases in support of their position including *Moore* v. *Alexander,* 85 Ark. 171, 107 S. W. 395; *Jobe* v. *Caldwell,* 99 Ark. 20, 136 S. W. 966; *Dickinson, Auditor* v. *Clibourn,* 125 Ark. 101, 187 S. W. 909, but in *McArthur* we said:

> ". . . These cases do not reach the issue raised since they deal with money in the state treasury and it appears to be well settled that such money must be disbursed by specific appropriations of not to exceed two years in duration. The real issue is whether these funds must be paid into the state treasury. If there is no such constitutional requirement, then there is no violation of the provisions relied upon by appellant and no conflict with the law of the above cited cases. This court has held, *Gipson* v. *Ingram,* 215 Ark. 812, 223 S. W. 2d 595, that there are certain public moneys, designated in that case

---

*Section 6 (a) provides for reimbursement into the state treasury and § 6 (b) provides that 20% be paid into the treasury.

'cash funds,' which may be controlled by the Legislature and in accordance with legislative directive need not be paid into the state treasury and need not be specifically appropriated. Appellant conceded that if the funds involved herein are 'cash funds' within the *Gipson* v. *Ingram* case, supra, that decision is controlling. The Court in the *Gipson* v. *Ingram decision, supra,* defined 'cash funds' as follows:

'So, for purposes of this topic 'cash funds' are those received by the state agencies and institutions from sources other than taxes, as that term 'taxes' is ordinarily used.'

Appellant would distinguish the *Gipson* v. *Ingram* decision, supra, on the ground that the moneys involved herein are derived from 'taxes' as that term is ordinarily used.

The Legislature has clearly designated the funds involved as 'cash funds' and we find no express constitutional restriction upon the supreme power of the Legislature to deal with public revenues of any type prior to the time such revenues are placed in the state treasury. Therefore, since the Constitution is a restriction upon the otherwise supreme power of the Legislature rather than a grant of power to the Legislature, there would appear to be no sound constitutional reason for nullifying the express legislative action in this particular. *Furthermore, these funds clearly qualify as moneys received from sources other than taxes,* as that term is ordinarily used." (Emphasis supplied).

*McArthur* is typical of the cases cited to us as well as the cases we have found, and none of them say whether *state revenues from excise taxes* must be appropriated in order to be used before they reach the state treasury. On the contrary, all of our cases approving distribution and use without appropriation have carefully distinguished special and cash funds from state revenues, and have held that special or cash funds need

not go into the state treasury and need not be appropriated out.

The funds derived from the excise tax levied under Act 239 are clearly state revenue and clearly within the prohibition of Amendment 20 if they are paid into the state treasury. Such funds are as much the revenues of the state as if they are deposited in the state treasurer's office, or by the state treasurer deposited in banks, and for the purpose of appropriation it might be argued with considerable logic, that state revenues from an excise tax should be considered as in the state treasury when it has been collected by the Commissioner of Revenues and held in banks or elsewhere. But in *Gipson* v. *Ingram, supra,* in connection with "treasury" as used in Article 16, § 12, Mr. Justice McFaddin, speaking for the court said:

> "The constitutional provisions, as above quoted, refer to 'the treasury.' The case of *Straub* v. *Gordon,* 27 Ark. 625 holds that 'the treasury' means the state treasury. So the constitutional language 'no money shall be paid out of (withdrawn from) the treasury. . .' necessarily refers only to money that has reached the *state* treasury, and does not refer to money held elsewhere."

A footnote in *Gipson* states:

> "*Straub* v. *Gordon* involved a provision of the Arkansas Constitution of 1868. The opinion was delivered in 1872, so the definition of 'treasury' had been judicially determined before those words were employed in our present Constitution of 1874."

We prefer to tread lightly and with caution when we approach the division line between the judicial and legislative authority and functions. While we prefer to answer the original question now, we do so on the side of caution. We recognize the legislature's authority to redirect the manner of withdrawal and disbursement of the funds levied under Act 239 and deposited in a bank or banks by the Commissioner of Revenues. We also recognize the legislature's inability to retrieve the funds once they are withdrawn and used. We, therefore, hold

that the funds held by the Commissioner of Revenues subject to withdrawal under subsections (2) and (3) must be maintained in their present status pending further directions from the legislature.

Affirmed in part and reversed in part.

HARRIS, C. J., GEORGE ROSE SMITH and BYRD, JJ., would adhere to their original view and would deny rehearing.

JOHN A. FOGLEMAN, Justice, concurring in part; dissenting in part. I concur in the opinion by Mr. Justice Jones, except that I adhere to the views expressed in my original dissenting opinion, Ark. 248, 1050A, 460 S. W. 2d 28. I recognize that if it can be said that the funds involved ever have reached or will reach the state treasury (and I understand that a majority of the court shares this view), then the funds must remain in the treasury awaiting appropriation for the purposes expressed in the act under the decision in *Moore* v. *Alexander,* 85 Ark. 171, 107 S. W. 395.

Statements relating to the powers of the legislature to determine whether funds are paid into the "state treasury" contained in *Gipson* v. *Ingram,* 215 Ark. 812, 223 S. W. 2d 595, and *McArthur* v. *Smallwood,* 225 Ark. 328, 281 S. W. 2d 428, are not expressions of a vagrant idea conjured up by this court to satisfy the exigencies of the particular situations presented in those cases. It seems to me that this idea is a fundamental view of constitutional law shared rather commonly by courts of last resort in states having identical, or virtually identical, constitutional provisions. For example:

Louisiana

*Louisiana State Department of Agriculture* v. *Sibille*
207 La. 877, 22 So. 2d 202 (1945)

An act imposed a tax of one cent per bushel on all sweet potatoes shipped in the state to be collected by the State Department of Agriculture and Immigration for the benefit of the Louisiana Sweet Potato Advertising Agency. This agency created by the act was charged with the duty of planning and conducting a campaign for promoting increased consumption of sweet potatoes. The tax was held to be an excise or license tax. The Louisiana Supreme Court said:

> Appellees' fourth complaint, listed in Paragraph (d) of their plea, is that the statute violates Article 4, Section 1 of the Louisiana Constitution, by providing for the disbursement of public money from the State Treasury without any specific appropriation and by undertaking to distribute the proceeds of the tax for a longer period than two years. The referred to constitutional provision reads in part: "No money shall be drawn from the treasury except in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years." According to Section 6 of the statute, the proceeds of the tax must be deposited in a special fund and all used by the Louisiana Sweet Potato Advertising Agency in conducting its publicizing and promotion campaign. By this method there is created a dedication, not an appropriation, and the mentioned constitutional provision is not violated.

## Kansas

### *State* v. *Kansas State Highway Commission*
139 Kan. 391, 32 P. 2d 493 (1934)

The legislature, pursuant to specific constitutional authority, levied special taxes for road and highway purposes on motor vehicles and on motor fuels. The funds had been held to be state funds in *State* v. *Kansas State Highway Commission*, 138 Kan. 913, 28 P.

2d 770. When the commission undertook to draw anticipation warrants to borrow federal funds, constitutional provisions were invoked to prevent the action. The Kansas Supreme Court said:

> Second, it is contended the act violates article 2, § 24, of our Constitution, which reads: "No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer term than two years."

> Answering this contention, we note, first, that the statute in question makes no appropriation for any length of time. The two acts together provide a method of conducting certain state business, which includes the borrowing of money for certain purposes and provisions for its repayment, but neither of them makes a specific appropriation. Another answer to the suggestion, much more fundamental, is this: Article 2, § 24, of our Constitution applies only to moneys that find their way into the state treasury. When our people, by amending article 11, § 8, of our Constitution, making two sections of it—8 and 9 (as renumbered 9 and 10)—so that the state could construct and maintain a state system of highways and levy special taxes on motor vehicles and motor fuels for that purpose, they made no specific provision that the moneys so raised and used should necessarily find their way into the state treasury, but left the Legislature free to provide for the collection and disbursement of such funds in the way it deemed best. What the Legislature did was to provide that these moneys, as collected, should be transmitted to the state treasurer and by him placed in the highway fund and disbursed on proper orders by the highway commission. Sections 17, 18, c. 225, Laws 1929, as amended by Laws 1933, c. 241, now R. S. Supp. 1933, 68—416, 68—417. Since these funds are not required by the Constitution to find their way into the state

treasury, and by statute do not do so, article 2, § 24, requiring appropriation of moneys from the state treasury, has no application. These funds are collected for a specific purpose. The Legislature would have no authority to appropriate them for other purposes. They are collected, segregated, set aside, and can be used for one purpose only, namely, the construction and maintenance of state highways. This is not the only fund the state has, which, although deposited with the state treasurer and disbursed by him under proper directions of other officials, does not find its way into the state treasury, and therefore does not require specific appropriation every two years by the Legislature.

## Montana

### Cottingham v. State Board of Examiners
134 Mont. 1, 328 P. 2d 907 (1958)

An initiative measure provided for payment of honorariums to veterans of World War II and levied a cigarette tax to be used to fund a bond issue for that purpose. The state legislature amended the act to include Korean War Veterans and levied an additional tax on cigarettes. The taxes collected were required to be paid into the state treasury and credited to a special fund entitled "War Veterans' Bond Redemption Fund." The Montana Supreme Court rejected the contention that this latter act, insofar as it attempted to appropriate proceeds of the cigarette tax for more than two years, was unconstitutional under sections of their constitution virtually identical with Article 5, Section 29 and Article 16, Section 12 of our Constitution.

## Oklahoma

### State ex rel Hawkins v. Oklahoma Tax Commission
462 P. 2d 536 (Okla. 1969)

A legislative enactment levied gasoline excise

taxes and apportioned same for specific purposes. A constitutional provision stated that "[n]o money shall ever be paid out of the treasury of this State, nor any of its funds, nor any funds under its management* * * unless such payments be made within two and one-half years after the passage of such appropriation act* * *." The court stated that it had previously approved the expenditure of special funds earmarked for a special purpose more than two and one-half years and held the constitutional provision inapplicable to *revenues levied and earmarked for a specific purpose which have accrued in a special fund.* The Oklahoma Supreme Court relied upon an earlier decision [*Edwards* v. *Childers,* 102 Okla. 158, 228 P. 472 (1924)] holding that the limitation did not apply to a case where the appropriation is that of a special fund created by a *continuing special tax, the whole of which is dedicated to a special purpose.*

### Illinois

### *People* v. *Handzik*
### 410 Ill. 295, 102 N. E. 2d 340 (1951)

A provision of the Medical Practice Act that all fines imposed for practice of medicine without license shall inure to the Department of Registration and Education was held not to be in violation of the constitutional provision that no money shall be drawn from the treasury except pursuant to an appropriation made by law.

Then there are numerous cases holding that disbursement of workmen's compensation and unemployment compensation funds financed by means of collection which can only be justified as excise, license or privilege taxes can be disbursed without any appropriation. See, *e. g., Tatum* v. *Wheeless,* 180 Miss. 800, 178 So. 95 (1938); *Commonwealth* v. *Perkins,* 342 Pa. 529, 21 A. 2d 45 (1941); *Friedman* v. *American Surety Co. of New York,* 137 Tex. 149, 151 S. W. 2d 570 (1941); *Department of Industrial Relations* v.

*West Boylston Mfg. Co.,* 253 Ala. 67, 42 So. 2d 787 (1949).

I note that our provisions for an unemployment compensation fund fall into this category. See Ark. Stat. Ann. § 81-1101 et seq. (Repl. 1960 and Supp. 1969). I also call attention to the provision for distribution of the state severance tax to counties. Ark. Stat. Ann. § 84-2112 (Repl. 1960).

To hold that an appropriation is necessary to release the funds allocated to a specific purpose and paid into a special fund outside the state treasury is to say that the legislature cannot effectively dedicate and make immediately available the proceeds of a particular tax or revenue to a particular agency when it has no means of accurately forecasting the revenues to be received or increases or declines of the source from time to time, even though it can never appropriate the revenue to any other purpose. Article 16, Section 11, Arkansas Constitution. I have not been able to perceive the purposes to be served by such a requirement. Such a fund, in the absence of appropriation, could only remain on deposit, forever, I assume.

While the decision in *Moore* v. *Alexander,* 85 Ark. 171, 107 S. W. 395, left a tax fund in just such a status, and gave some plausible reasons why a legislature might do so, I emphasize that there is no doubt that the special tax funds there involved were paid into the state treasury and moneys expended were to be paid upon warrants drawn by the state auditor upon the treasury. Sections 7 and 13, Act 132 of 1901; Sections 6 and 10, Act 146 of 1903.

Even if an appropriation is necessary before the funds can be spent because they are in the state treasury, Section 6 of the Act would not be materially affected. It would read:

SECTION 6. All revenues derived from the tax

levied by this Act shall be paid over to the Commissioner of Revenues and shall be deposited in one or more banks selected by him and from time to time withdrawn from such banks in the proportions indicated for use for the following purposes;

(a) An amount not exceeding three per cent (3%) of such deposits for payment of the expenses of the Commissioner of Revenues in administering the provisions of this Act, including the costs of designing and printing the documentary stamps, the preparation and printing of information material and of any regulations which he may promulgate with respect to the use of such stamps and their safekeeping, and for reimbursing the State Treasury for any such expenses of administration hereunder which were paid by the use of State-appropriated funds.

(b) The remainder thereof, but not less than ninety-seven per cent (97%) shall be deposited by the Commissioner of Revenues as follows:

(1) Twenty per cent (20%) shall be deposited by the Commissioner of Revenues in the State Treasury and credited to the County Aid Fund and distributed at the end of each month to the respective counties from which the revenues originated.

(2) Forty per cent (40%) thereof to the Arkansas Children's Colony Board (the "Colony Board"). Funds so remitted to the Colony Board are hereby specifically declared to be cash funds and shall not be deposited in the State Treasury but shall be deposited in trust in a bank or banks in this State, as the Colony Board may from time to time select and used by the Colony Board, as it shall determine, to operate, maintain, develop and improve institutional and community facilities and services for the mentally retarded, and all or any part may

be pledged to and used for the payment of revenue
bonds issued by the Colony Board pursuant to Act
186 of 1963, as and to the same extent as the
charges referred in Section 7 of Act 186 of 1963.
So long as any revenue bonds are outstanding, to
the payment of which revenues derived from the
tax levied by this Act are pledged, the tax levied
by this Act shall continue to be collected and the
revenues derived therefrom shall continue to be
deposited as provided in this Act and to be pledged
to and used for the payment of the outstanding
bonds, principal and interest, until the outstanding
bonds are fully paid or adequate provision made
therefor; and

(3) Forty per cent (40%) thereof to the State Parks,
Recreation and Travel Commission of the State of
Arkansas (the "Commission"). Funds so remitted
to the Commission are hereby specifically declared
to be cash funds and shall not be deposited in the
State Treasury but shall be deposited in trust in
a bank or banks in this State as the Commission
may select, and used by the Commission as it shall
determine, to operate, maintain, develop and im-
prove the Public Parks System of the State, and all
or any part may be pledged and used for the pay
ment of revenue bonds issued by the Commission
pursuant to Act No. 539 of 1953, as amended, as
and to the same extent as revenues derived from the
properties and equipment of the State Parks Sys
tem. So long as any revenue bonds are outstand-
ing, to the payment of which revenues derived from
the tax levied by this Act are pledged, the tax levied
by this Act shall continue to be collected and the
revenues derived therefrom shall continue to be
deposited as provided in this Act and to be pledged
to and used for the payment of the outstanding
bonds, principal and interest, until the outstanding
bonds are fully paid or adequate provision made
therefor

See *Moore* v. *Alexander,* 85 Ark 171, 107 S. W.
395.

Under the most extreme construction of the majority opinion possible the section would read:

SECTION 6. All revenues derived from the tax levied by this Act shall be paid over to the Commissioner of Revenues and shall be deposited in one or more banks selected by him * * * for use for the following purposes;

(a) An amount not exceeding three per cent (3%) of such deposits for payment of the expenses of the Commissioner of Revenues in administering the provisions of this Act, including the costs of designing and printing the documentary stamps, the preparation and printing of information material and of any regulations which he may promulgate with respect to the use of such stamps and their safekeeping, and for reimbursing the State Treasury for any such expenses of administration hereunder which were paid by the use of State-appropriated funds.

(b) The remainder thereof, but not less than ninety-seven per cent (97%) shall be deposited by the Commissioner of Revenues as follows:

(1) Twenty per cent (20%) shall be deposited by the Commissioner of Revenues in the State Treasury and credited to the County Aid Fund and distributed at the end of each month to the respective counties from which the revenues originated.

(2) Forty per cent (40%) thereof to the Arkansas Children's Colony Board (the "Colony Board") * * * to operate, maintain, develop and improve institutional and community facilities and services for the mentally retarded * * *

(3) Forty per cent (40%) thereof to the State Parks, Recreation and Travel Commission of the State of Arkansas (the "Commission") * * * to operate, maintain, develop and improve the Public Parks System of the State * * *

BROWN, J., joins in the preceding opinion.

GEORGE ROSE SMITH, Justice, concurring and dissenting. On rehearing, concurring in part and dissenting in part. I join in the majority holding that money raised by taxation must be appropriated by the General Assembly before it can be spent. We have not one but two constitutional provisions prohibiting the withdrawal of funds from the public treasury except in pursuance of a specific legislative appropriation. Ark. Const., Art. 5, § 29, and Art. 16, § 12. The State's financial stability depends to a great degree upon that wholesome restriction on the spending power. The importance of this constitutional principle was clearly stated in *Dickinson* v. *Edmondson,* 120 Ark. 80, 178 S. W. 930, Ann. Cas. 1917C, 913 (1915), in words frequently quoted in later cases:

> [I]t is plain that the framers of the Constitution intended to place an unmistakable limitation upon the authority of public officials in paying out public funds, and to declare that all the State funds which are within the purview of that provision must be held in the treasury, until a specific appropriation thereof has been made by the Legislature. The power of the General Assembly with respect to the public funds *raised by general taxation,* is supreme, and no State official, from the highest to the lowest, has any power to create an obligation of the State, either legal or moral, unless there has first been a specific appropriation of funds to meet the obligation. (My italics.)

I also join the majority in rejecting the suggestion that the General Assembly can circumvent such an important constitutional limitation simply by directing that tax money be held in a special bank account rather than be commingled with other public funds. If the constitutional prohibition could be sidestepped as easily as that, it might as well not have been written in the first place. Quite obviously, as the Supreme Court of Michigan held in a similar situation, the reference to the

"treasury" means the State's public funds in general, rather than any particular room in the state capitol or any particular bank account. *People* v. *McKinney,* 10 Mich. 54 (1862). We recognized a narrow exception to the general rule, with respect to cash funds, in *Gipson* v. *Ingram,* 215 Ark. 812, 223 S. W. 2d 595 (1949), but that opinion emphasized again and again that the court was referring only to cash funds not derived from the levy of taxes. That case is not authority for the view that money raised by the power of taxation can be spent without a legislative appropriation.

I am unable, however, to agree with the majority holding, on rehearing, that Act 239 is severable; that is, that the levy of the documentary stamp tax is valid even though, for want of an appropriation, the revenue derived from the tax must accumulate as an idle fund in the state treasury for at least two years, and conceivably for a decade or more, until the legislators are able to agree upon the manner in which the ever-increasing fund is to be spent.

The majority's view, in my opinion, is so unrealistic as to be an excursion into the realm of fancy. We all know that the levy of a new tax is probably the most unpopular of all measures to come before any legislature. We all know that the lawmakers can be persuaded to approve a new tax only upon a clear showing that the money is needed urgently and immediately. Yet four members of this court now solemnly declare that the General Assembly of the State of Arkansas would have insisted upon the levy of this new tax even if the legislators had known that the ensuing revenues could not be spent for at least two years and would idly accumulate in the public treasury for that length of time. I daresay that never in the history of any of the fifty states has any legislative body ever levied a new tax merely for the pleasure of seeing the money lie unused in the public coffers for the indefinite future. The majority have not convinced me that the members of our General Assembly were so utterly unaware of the wishes of their constituents as to embark upon such a course by the enactment of the act now in contro-

versy. Let it be shown on the permanent records of this court that I dissent.

HARRIS, C. J. and BYRD, J., join in this opinion.

CONLEY BYRD, Justice, concurring and dissenting. I concur with the opinion of Justice George Rose Smith, but in addition, I think that I should point out the inconsistency of the majority opinion on rehearing.

As I understand the majority opinion on rehearing, it is holding among other things that subsections 6(b) (2) and 6(b) (3) of the Act violate Article 5, § 29 and Article 16, § 12 of the constitution. I submit that if the money to be paid out under those sections is unconstitutional, then the provisions of subsection 6(a) authorizing the Commissioner of Revenues to use 3% of the tax collected without an appropriation is also invalid.

Furthermore, in view of the court's holding that the Commissioner must hold the money to be used under subsections 6(b) (2) and 6(b) (3) in the bank, contrary to the language at the beginning of section 6, we must also strike the words from that section which allows him to withdraw the funds, "from time to time." Of course this creates a problem in leaving the authority to the Commissioner for purposes of subsections 6(a) and 6(b) (1).

When all of the invalid provisions of Section 6 are struck out it looks like this:

"SECTION 6. All revenues derived from the tax levied by this Act shall be paid over to the Commissioner of Revenues and shall be deposited in one or more banks selected by him ~~and from time to time withdrawn from such banks in the proportions indicated~~ for use for the following purposes;

(a) ~~An amount not exceeding three per cent (3%) of such deposits for payment of the expenses of the Commissioner of Revenues in administering~~

the provisions of this Act, including the costs of designing and printing the documentary stamps, the preparation and printing of information material and of any regulations which he may promulgate with respect to the use of such stamps and their safekeeping, and for reimbursing the State Treasury for any such expenses of administration hereunder which were paid by the use of State appropriated funds.

(b) The remainder thereof, but not less than ninety-seven per cent (97%) shall be deposited by the Commissioner of Revenues as follows:

(1) Twenty per cent (20%) shall be deposited by the Commissioner of Revenues in the State Treasury and credited to the County Aid Fund and distributed at the end of each month to the respective counties from which the revenues originated.

(2) Forty per cent (40%) thereof to the Arkansas Children's Colony Board (the 'Colony Board'). Funds so remitted to the Colony Board are hereby specifically declared to be cash funds and shall not be deposited in the State Treasury but shall be deposited in trust in a bank or banks in this State, as the Colony Board may from time to time select and used by the Colony Board, as it shall determine, to operate, maintain, develop and improve institutional and community facilities and services for the mentally retarded, and all or any part may be pledged to and used for the payment of revenue bonds issued by the Colony Board pursuant to Act 186 of 1963, as and to the same extent as the charges referred in Section 7 of Act 186 of 1963. So long as any revenue bonds are outstanding, to the payment of which revenues derived from the tax levied by this Act are pledged, the tax levied by this Act shall continue to be collected and the revenues derived therefrom shall continue to be deposited as provided in this Act and to be pledged to and used for the payment of the outstanding

bonds, principal and interest, until the outstanding
bonds are fully paid or adequate provision made
therefor; and

(3) Forty per cent (40%) thereof to the State Parks,
Recreation and Travel Commission of the State of
Arkansas (the 'Commission'). Funds so remitted to
the Commission are hereby specifically declared to
be cash funds and shall not be deposited in the
State Treasury but shall be deposited in trust in a
bank or banks in this State as the Commission
may select, and used by the Commission as it shall
determine, to operate, maintain, develop and im
prove the Public Parks System of the State, and
all or any part may be pledged and used for the
payment of revenue bonds issued by the Commis
sion pursuant to Act No. 539 of 1953, as amended,
as and to the same extent as revenues derived from
the properties and equipment of the State Parks
System. So long as any revenue bonds are outstand
ing, to the payment of which revenues derived from
the tax levied by this Act are pledged, the tax
levied by this Act shall continue to be collected
and the revenues derived therefrom shall continue
to be deposited as provided in this Act and to be
pledged to and used for the payment of the out
standing bonds, principal and interest, until the
outstanding bonds are fully paid or adequate pro
vision made therefor."

Thus when we strike the invalid portions it is at
once obvious to me that the residue is so mutually
connected with and dependent on the invalid portions
as to warrant the belief that the Legislature would not
have passed the residue independently.

This disposition makes unnecessary a determination as to the validity of Section 6 under Article V, § 29, (see *Gipson* v. *Ingram,* supra,) as suggested by one brief but not fully argued by any party to this litigation.

Reversed and remanded.

BROWN & FOGLEMAN, JJ., dissent in part.